# Exhibit 1

Filed 11/14/2018 1:30 PM
Reba Squyres, District Clerk
Angelina County, Texas
By: Brittany Crawford,
Deputy Clerk

**CAUSE NO.** CV-00785-18-11

| | | |
|---|---|---|
| **COUNTY OF ANGELINA,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | **_____ JUDICIAL DISTRICT** |
| | § | |
| **PURDUE PHARMA L.P.**; | § | |
| **PURDUE PHARMA INC.**; | § | |
| **THE PURDUE FREDERICK COMPANY**; | § | |
| **JOHNSON & JOHNSON**; | § | **ANGELINA COUNTY, TEXAS** |
| **JANSSEN PHARMACEUTICALS, INC.**; | § | |
| **ORTHO-MCNEIL-JANSSEN** | § | |
| **PHARMACEUTICALS, INC.** n/k/a | § | |
| JANSSEN PHARMACEUTICALS, INC.; | § | |
| **JANSSEN PHARMACEUTICA INC.** n/k/a | § | |
| JANSSEN PHARMACEUTICALS, INC.; | § | |
| **ENDO HEALTH SOLUTIONS INC.**; | § | |
| **ENDO PHARMACEUTICALS, INC.**; and | § | |
| **DOES 1 – 100, INCLUSIVE**, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL PETITION AND JURY DEMAND

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff, the County of Angelina, Texas, by and through the undersigned attorneys, (hereinafter "Angelina County" or "County") against Defendants Purdue Pharma L.P., Purdue Pharma Inc., The Purdue Frederick Company, Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica Inc. n/k/a Janssen Pharmaceuticals, Inc., Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., and Does 1 – 100, alleges as follows:

## I.    INTRODUCTION

1.    The United States is in the midst of an opioid epidemic caused by Defendants' fraudulent marketing, sales, and distribution of prescription opioids ("opioids") that has resulted

in addiction, criminal activity, and loss of life.[1] Americans "consume 85% of all the opioids in the world" and are "the most medicated country in the world . . . ."[2] The opioid crisis has been described as "the AIDS epidemic of our generation, but even worse."[3] On October 26, 2017, President Donald Trump "declared a nationwide public health emergency to combat the opioid crisis."[4]

2.     In 1997, each person in the United States, on average, consumed 96 mg morphine equivalents. In 2010 that number increased to 710 mg per person.[5] This amount has been estimated as the equivalent to 7.1 kg of opioids per 10,000 people – or enough to supply each American with 5 mg of hydrocodone every 6 hours for 45 days.[6]

3.     It's no surprise that in 2016 alone, health care providers wrote more than 289 million prescriptions for opioids, enough for *every adult in the United States* to have more than one bottle of pills.[7] The prescription rate in Angelina County is substantially higher than the national average.[8]

4.     Unfortunately, using opioids too often leads to addiction and overdose from opioids. It was estimated as early as 2001 that up to 40% of chronic pain patients were addicted to opioid pain medication.[9] Almost 2 million Americans were addicted to opioids in 2014.[10] To put

---

[1] L. Manchikanti, *Opioid Epidemic in the United States*, Pain Physician, Jul. 2012, at 1, www.painphysicianjournal.org, attached hereto as Exhibit A.
[2] David Wright, *Christie on Opioids: "This is the AIDS Epidemic of Our Generation, but even Worse,"* CNN, Oct. 27, 2017, *available at* http://www.cnn.com/2017/10/27/politics/chris-christie-opioid-commission-aids-cnntv/index.html; Manchikanti, Ex. A, at 16 ("Gram for gram, people in the United States consume more narcotic medication than any other nation worldwide.").
[3] Wright, *supra*.
[4] Dan Merica, *What Trump's Opioid Announcement Means – and Doesn't Mean*, CNN, Oct. 26, 2017, *available at* http://www.cnn.com/2017/10/26/politics/national-health-emergency-national-disaster/index.html.
[5] Manchikanti, Ex. A, at 14.
[6] *Id.*
[7] *Prevalence of Opioid Misuse*, BupPractice, Sept. 7, 2017, *available at* https://www.buppractice.com/node/15576.
[8] Center for Disease Control, *available at* https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.
[9] *Prescription Drugs:  Abuse and Addiction*, National Institute of Drug Abuse (NIH Publication), Jul. 2001, at 13.
[10] *National Survey on Drug Use and Health*, Substance Abuse and Mental Health Services Administration, 2014.

the opioid crisis in perspective, the statistics demonstrate:

·   Roughly 21 to 29 percent of patients prescribed opioids for chronic pain misuse them;

·   Between 8 and 12 percent develop an opioid use disorder; and

·   About 80 percent of people who use heroin first misused prescription opioids.[11]

5.      In 2014, more people died from drug overdoses than in any other year. Currently more than 90 Americans die every day after overdosing on opioids.[12] The Texas Legislature has found "that deaths resulting from the use of opioids and other controlled substances constitute a public health crisis."[13]

6.      In fact, accidental drug overdose deaths, of which reportedly at least two-thirds are opioid overdoses, are the leading cause of death for Americans under the age of 50. And these accidental opioid drug overdose deaths exceed the number of deaths caused by cars or guns. A report from the CDC found that from July 2016 to September 2017, emergency visits due to suspected opioid overdoses continued to climb approximately 30% across the nation.[14] The increase was seen in adults of all age groups and in men and women in all geographic areas.[15]

7.      Over the next decade, the average number of deaths due to opioids is expected to be 500,000.[16] Proof that the opioid epidemic is far from slowing is the latest statistic that

---

[11] *Opioid Overdose Crisis*, National Institute on Drug Abuse, Jan. 2018, *available at* https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis.

[12] *Id*.

[13] Tex. Att'y Gen. Op. No. KP-0168 (2017), *citing* Act of May 26, 2017, 85th Leg., R.S., ch. 534, § 3, 2017 Tex. Sess. Law Serv. 1467, 1468.

[14] Jacqueline Howard, *ER Visits for Opioid Overdose up 30%, CDC Study Finds*, CNN, Mar. 6, 2018.

[15] *Id.*

[16] Max Blau, *STAT forecast:  Opioids Could Kill Nearly 500,000 American in the next Decade*, STAT, June 27, 2017, *available at* https://www.statnews.com/2017/06/27/opioid-deaths-forecast/;  *see also* Wes Rapaport, *Advocates for Painkiller Advocates Wants Society to Meet Them Halfway*, Big Country, Feb. 18, 2018 (stating the number of opioid overdose deaths is going to go up for at least several more years and explaining how Operation Naloxone has administered more than $1 million of the powerful antidote).

approximately 72,000 Americans died from drug overdoses last year in 2017.[17] This increase is due to a growing number of Americans using opioids and the opioids themselves are becoming more deadly.[18] The economic burden caused by opioid abuse in the United States is at least $78.5 billion,[19] including lost productivity and increased social services, health insurance costs, increased criminal justice presence and strain on judicial resources, and substance abuse treatment and rehabilitation.[20] In 2015, Texas "had the second highest total healthcare costs from opioid abuse in the nation ($1.96 billion) . . . ."[21]

8.    This epidemic did not occur by chance. Defendants manufacture, market, distribute, and sell prescription opioids, including, but not limited to, brand-name drugs like OxyContin, Opana, Percocet, Percodan, Duragesic, Ultram, Ultracet, and generics like oxycodone, oxymorphone, hydromorphone, hydrocodone, fentanyl, and tramadol, which are powerful narcotics.

9.    Historically, opioids were considered too addictive and debilitating for treating non-cancer chronic pain,[22] such as back pain, migraines, and arthritis, and were used only to treat short-term acute pain or for palliative or end-of-life care.

10.    By the late 1990s or early 2000s, however, each Defendant began a marketing scheme to persuade doctors and patients that opioids were not addictive and should be used

---

[17] Margot Sanger-Katz, *Bleak New Estimates in Drug Epidemic: A Record 72,000 Overdose Deaths in 2017*, The New York Times, Aug. 15, 2018, https://www.nytimes.com/2018/08/15/upshot/opioids-overdose-deaths-rising-fentanyl.html (representing a 9.5 percent increase from 2016).
[18] *Id.*
[19] *CDC Foundation's New Business Pulse Focuses on Opioid Overdose Epidemic*, Centers for Disease Control and Prevention, Mar. 15, 2017, *available at* https://www.cdc.gov/media/releases/2017/a0315-business-pulse-opioids.html.
[20] *Opioid Overdose Crisis, supra.*
[21] Kerry Craig, *Opioid Addiction Results in one Woman's Daily Struggle*, Sulphur Springs News-Telegram, Oct. 7, 2017, *available at* https://www.ssnewstelegram.com/news/opioid-addiction-results-in-one-woman-s-daily-struggle/article_bded4eoa-ab80-11e7-a252-d3f304e26628.html.
[22] "Chronic pain" means non-cancer pain lasting three months or longer.

ubiquitously and perpetually to treat moderate, non-cancer chronic pain.[23] Defendants' efforts to "increase opioid use" and their campaign emphasizing "the alleged undertreatment of pain continue to be significant factors of the [opioid] escalation."[24] Defendants reassured the medical community that opioids were not addictive and doctors prescribed them at a higher rate.[25] Consequently, the National Institute of Drug Abuse attributes the opioid crises to Defendants' successful marketing campaign.[26] Each Defendant spent, and continues to spend large sums of money to promote the benefits of opioids for non-cancer moderate pain while trivializing or even denying their risks.

11.    The Defendants' promotional messages deviated substantially from any approved labeling of the drugs and caused prescribing physicians and consuming patients to underappreciate the health risks, and to overestimate the benefits of opioids.

12.    Contrary to the language of their drugs' labels, Defendants falsely and misleadingly, in their marketing: (1) downplayed the serious risk of addiction; (2) promoted and exaggerated the concept of "pseudoaddiction" thereby advocating that the signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction.

---

[23] *See e.g., Opioid Overdose Crisis*, National Institute on Drug Abuse, Jan. 2018, *available at* https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis (explaining the greater rate of prescribing opioids due to misinformation to physicians, which led to a diversion and misuse of opioids before anyone knew opioids were highly addictive).

[24] Manchikanti, Ex. A, at 1.

[25] CDC/NCHS, *National Vital Statistics System, Mortality*, CDC Wonder, Atlanta, Ga:  US Department of Health and Human Services, 2017, *available at https://wonder.cdc.gov.*

[26] *See id.*

PLAINTIFF'S ORIGINAL PETITION                                                                                      5

13.     Defendants disseminated these falsehoods through ads, sales representatives, and/or hand-picked physicians who supported Defendants' message. Sales representatives, working at Defendants' behest, promoted highly addictive opioids through souvenirs and toys including, but not limited to, opioid brand-bearing stuffed plush toys, dolls, coffee cups, fanny packs, water bottles, notepads, pens, refrigerator magnets, clocks, letter openers, rulers, daytime planners, bags, puzzles, posters, hand-held calculators, clipboards, highlighters, flashlights, key chains, clothing, reflex mallets, and mock-ups of the United States Constitution.

14.     Defendants also used third parties they controlled by:  (a) funding, assisting, encouraging, and directing doctors, known as "key opinion leaders" ("KOLs") and (b) funding, assisting, directing, and encouraging seemingly neutral and credible professional societies and patient advocacy groups (referred to hereinafter as "Front Groups").

15.     Defendants worked with KOLs and Front Groups to taint the sources that doctors and patients relied on for ostensibly "neutral" guidance, such as treatment guidelines, Continuing Medical Education ("CME") programs, medical conferences and seminars, and scientific articles. Through their individual and concerted efforts, Defendants convinced doctors that instead of being addictive and unsafe for long-term use in most circumstances, opioids were *required* in the compassionate treatment of chronic pain, which Defendants termed an epidemic in America.

16.     Defendants' aggressive marketing of opioids for chronic pain is "based on unsound science and blatant misinformation, and accompanied by the dangerous assumptions that opioids are highly effective and safe, and devoid of adverse events when prescribed by physicians."[27] Nevertheless, Defendants' marketing was effective and, by 2011 there were 136.7 million prescriptions for hydrocodone alone, with all opioids exceeding 238 million.[28] Data demonstrates

---

[27] Manchikanti, Ex. A, at 1-4.
[28] *Id.*

that "[o]ver 90% of patients received opioids for chronic pain management."[29]

17.    Essentially each Defendant ignored science and consumer health for profits. Defendants' efforts were so successful that opioids are now the <u>most</u> prescribed class of drugs generating $11 billion in revenue for drug companies in 2014 alone.  Sales for Purdue's OxyContin grew from $48 million in 1996 to $1.1 billion in 2000 after it successfully and aggressively marketed and promoted its opioid.[30] In fact, OxyContin was a "leading drug of abuse" by 2004 through its availability.[31] Even after Purdue reached a $600 million federal settlement in 2007, the settlement failed to impact what is a "$13-billion-a-year opioid industry."[32]

18.    As a direct and foreseeable consequence of Defendants' misrepresentations and misleading marketing campaign to Angelina County physicians and residents regarding the safety and efficacy of using opioids for chronic non-cancer pain that resulted in an oversupply of opioids, Angelina County has spent and continues to spend large sums of money combatting the public health crisis.

19.    The money Angelina County has spent comes directly from its taxpayers. These taxpayers include Angelina County physicians, who passed on Defendants' misleading safety and efficacy information and prescribed more opioids to taxpaying residents in Angelina County. These taxpayers also included Angelina County residents who either suffered the addictive effects of consuming opioids or overdosed using Defendants' opioids that had been over-prescribed and over-supplied to Angelina County as intended by Defendants herein. Thus, this group of Angelina County residents has suffered not only injury to property, but also bodily injury, as a result of

---

[29] Manchikanti, Ex. A, at 1-4.
[30] Art Van Zee, M.D., *The Promotion and Marketing of OxyContin:  Commercial Triumph, Public Health Tragedy*, 99 Am. J. Public Health 221, Feb. 2009, at 1, attached hereto as Exhibit B.
[31] Zee, *supra*.
[32] Rebecca L. Haffajee, J.D., Ph.D., M.P.H. and Michelle M. Mello, J.D., Ph.D., *Drug Companies' Liability for the Opioid Epidemic*, N. Engl. J. Med., Dec. 14, 2017, at 2305.

Defendants' misconduct in the false promotion and/or over-supply of prescription opioids.

20.     Angelina County has spent and continues to spend large sums of money combatting the opioid crisis created by Defendants' negligent and fraudulent marketing campaign. Across the country, including Texas, increased opioid prescribing has caused and continues to cause an increase in overdoses and death. Defendants tracked the CDC data and knew that the more they promoted opioid prescribing and distributed more opioids that non-therapeutic outcomes, such as overdose, addiction, and criminality would occur. By 2010, enough opioids had been sold to medicate every American adult with a typical dose of 5 mg of hydrocodone every 4 hours for 1 month.[33] The increased use of opioids has contributed to the increased rate of overdose deaths and nonmedical use with the varying rates of sales in each state impacting the outcomes in each state.[34] "Given that 3% of physicians accounted for 62% of the [opioids] prescribed in one study, the proliferation of high-volume prescribers can have a large impact on state use of [opioids] and overdose death rates."[35] Not surprisingly, "[l]arge increases in overdoses involving the types of drugs sold by illegitimate pain clinics (i.e., 'pill mills') have been reported in Florida and Texas."[36] In Angelina County, the prescription rate per 100 people in 2015 was 105.4, which means that every man, woman, and child in Angelina County could have had at least one bottle of opioids.[37] From 2015 - 2016, there were 10 – 11.9 deaths per 100,000 people reported from drug overdoses.[38] A substantial number of those overdose deaths were a result, in whole or in part, of opioid ingestion. Defendants' marketing misconduct, as well as Defendants' efforts to sell more prescription opioids than can be consumed therapeutically, were natural and foreseeable causes of

---

[33] Center for Disease Control, *Vital Signs: Overdoses of Prescription Opioid Pain Relievers – United States, 1999-2008*, Morbidity and Mortality Weekly Report (MMWR), Nov. 4, 2011.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] Center for Disease Control, *available at* https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.
[38] Center for Disease Control, *available at* https://www.cdc.gov/nchs/data-visualization/drug-poisoning-mortality.

overdose deaths and injuries in Angelina County.

21.     As a direct and foreseeable consequence of Defendants' conduct described regarding prescription opioids, Angelina County has committed and continues to commit resources to provide and pay additional health care, law enforcement, social services, public assistance, pharmaceutical care and other services necessary for its residents.

## II.     RULE 47 STATEMENT OF MONETARY RELIEF SOUGHT

22.     Per Rule 47 of the Texas Rules of Civil Procedure, the County states that although the full measure of its damages is still being calculated, its damages caused by Defendants' acts and omissions exceed $1,000,000 but are believed to be less than $100,000,000. Accordingly, at this time in the litigation, Angelina County states that it is seeking monetary relief for an amount greater than $1,000,000 and less than $100,000,000, the rightful and just amount to be determined by the jury.

## III.     STANDING

23.     Angelina County has standing to bring this lawsuit because it has suffered an injury-in-fact caused by Defendants' misconduct, and that harm can be redressed through this action. Having decided that it was necessary to pursue these claims to protect the County's interests, the County hired outside counsel to handle the litigation.[39] The contract governing the County's representation in this litigation was approved by the Texas Comptroller of Public Accounts pursuant to Tex. Gov't Code § 403.0305.[40]

24.     Defendants' misconduct has placed an unreasonable burden on Angelina County's resources and ability to provide the public services and employee benefits it is obligated to and/or

---

[39] *See* Resolution for approval of bringing suit on behalf of Angelina County, Texas, vs. various drug manufacturers, developers, suppliers and others of a class of pharmaceutical class of drugs commonly referred to as opioids and approval of Professional Services Agreement for Special Counsel attached hereto as Exhibit G and Executed and Approved Retention Agreement attached hereto as Exhibit H.
[40] *See* Exhibit H.

has authority to provide to its residents and employees. Angelina County has the statutory duty and/or authority to provide public safety and health services, including, but not limited to, the following:

- Supporting paupers;[41]

- Providing county jails;[42]

- Providing health care in county jails;[43]

- Providing fire protection;[44]

- Enforcing drug laws;[45]

- Contracting with drug centers;[46]

- Commissioning drug education and counseling programs;[47] and

- Paying county and precinct officers and employee compensation, office and travel expenses, and any other allowances.[48]

25.    Defendants' misconduct − including Defendants' calculated marketing campaign of misinformation to physicians and patients − caused the damages to the County. They misled physicians into overprescribing opioids, which directly created the need for dramatically increased public services. The County relied on these misrepresentations in paying for its employees' healthcare costs causing the County to incur increased healthcare costs for its own employees.

26.    The harm caused by Defendants' misconduct can be redressed by the Court in this action. Defendants should be enjoined from continuing to manufacture, distribute, and sell opioids in Angelina County without educating physicians and patients about the actual risks and benefits

---

[41] Tex. Local Gov't Code § 81.027.
[42] Id. at § 351.001.
[43] Id. at § 351.045.
[44] Id. at § 352.001.
[45] Id. at § 370.003.
[46] Tex. Health & Safety Code at § 464.032.
[47] Id. at § 465.001
[48] Tex. Local Gov't Code § 152.011.

of its drugs. Furthermore, Defendants should compensate Angelina County for the funds it has expended and continues to expend for medical insurance claims for opioids that were not medically necessary, as well as increased costs of social services, health systems, law enforcement, the judicial system, and treatment facilities.

## IV.    <u>VENUE AND JURISDICTION</u>

27.    Venue is proper in Angelina County because all or a substantial part of the events or omissions giving rise to this claim occurred in Angelina County. TEX. CIV. PRAC. & REM. CODE §15.002(a)(2). This Court has subject-matter jurisdiction over this matter because Plaintiff's damages are in excess of the minimal jurisdictional limits of this Court. TEX. GOVT. CODE §24.007(b).

28.    This Court has specific jurisdiction over all Defendants as their activities were directed toward Texas, and injuries complained of herein resulted from their activities. *Guardian Royal Exchange Assur., Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 227 (Tex. 1991). Each Defendant has a substantial connection with Texas and the requisite minimum contacts with Texas necessary to constitutionally permit the Court to exercise  jurisdiction. *See id.* at 226.

## V.    <u>PARTIES</u>

### A.    Plaintiff

29.    This action is brought for and on behalf of Angelina County, which provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

### B.    Defendants

30.    PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware with its principal place of business in Stamford, Connecticut, and has at all times relevant to this litigation, conducted business in this State. Said limited partnership is required to maintain

a registered agent for service of process but has not designated such an agent. Therefore, said limited partnership may be served with process through the Secretary of State for the State of Texas at its registered agent in Delaware, The Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, DE 19808, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045.  PURDUE PHARMA L.P. is, through its ownership structure, a Texas resident. PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut, and has at all times relevant to this litigation, conducted business in this State. Said corporation is required to maintain a registered agent for service of process but has not designated such an agent. Therefore, said corporation may be served with process through the Secretary of State for the State of Texas at its registered agent in Delaware, Corporation Service Company, 80 State Street, Albany, NY 12207, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut, and has at all times relevant to this litigation, conducted business in this State. Said corporation is required to maintain a registered agent for service of process but has not designated such an agent. Therefore, said corporation may be served with process through the Secretary of State for the State of Texas at its registered agent in Delaware, The Prentice-Hall Corporation System, Inc., 251 Little Falls Drive, Wilmington, DE 19808, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045 (Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company are hereinafter referred to as  "Purdue").

31.     Purdue manufactures, promotes, sells, and distributes opioids in the U.S. and Angelina County. Purdue's opioid drug, OxyContin, is one of the most addictive and abused prescription drugs in American history. Purdue promotes opioids throughout the United States and

in Angelina County.

      32.     JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201. JANSSEN PHARMACEUTICALS, INC. is a wholly owned subsidiary of JOHNSON & JOHNSON. JOHNSON & JOHNSON ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey, and has at all times relevant to this litigation conducted business in this State. Said corporation is required to maintain a registered agent for service of process but has not designated such an agent. Therefore, said corporation may be served with process through the Secretary of State for the State of Texas at its corporate headquarters, Attention: Legal Department, One Johnson & Johnson Plaza, New Brunswick, NJ 08933, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201.  JANSSEN PHARMACEUTICA INC., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit (Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc.,

Janssen Pharmaceutica Inc., and J&J are hereinafter referred to as "Janssen").

33.    Janssen manufactures, promotes, sells, and distributes opioids in the U.S. and in Angelina County.

34.    ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania, and has at all times relevant to this litigation conducted business in this State. Said corporation is required to maintain a registered agent for service of process but has not designated such an agent. Therefore, said corporation may be served with process through the Secretary of State for the State of Texas at its registered agent in Delaware, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801, pursuant to the Texas Long-Arm Statute, Tex. Civ. Prac. & Rem. Code §§ 17.041-.045. ENDO PHARMACEUTICALS, INC., a wholly-owned subsidiary of ENDO HEALTH SOLUTIONS INC., is a Delaware corporation with its principal place of business in Malvern, Pennsylvania, and may be served through its registered agent for service of process, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, TX 75201 (Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. are hereinafter referred to as "Endo").

35.    Endo develops, markets, and sells opioid drugs in the U.S. and in Angelina County. Endo also manufactures and sells generic opioids in the U.S. and Angelina County, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

36.    The County lacks information sufficient to specifically identify the true names or capacities, whether individual, corporate or otherwise, of Defendants sued herein under the fictitious names DOES 1 through 100 inclusive. The County will amend this Petition to show their true names and capacities if and when they are ascertained. Angelina County is informed and believes, and on such information and belief alleges, that each of the Defendants named as a DOE

has engaged in conduct that contributed to cause events and occurrences alleged in this Petition and, as such, shares liability for at least some part of the relief sought herein.

## VI.    FACTUAL ALLEGATIONS

37.    Before the 1990s, generally accepted standards of medical practice dictated that opioids should be used only for short-term acute pain – pain relating to recovery from surgery or for cancer or palliative (end-of-life) care. Using opioids for chronic pain was discouraged or even prohibited because there was a lack of evidence that opioids improved patients' ability to overcome pain and function. Instead the evidence demonstrated that patients developed tolerance to opioids over time, which increased the risk of addiction and other side effects.

38.    After the 1990s, Defendants dramatically changed doctors' views regarding opioids through a well-funded deceptive marketing scheme. Defendants were so successful that, according to the National Safety Council, 74% of *all* doctors prescribe opioids for chronic back pain and 55% prescribe opioids for dental pain, "neither of which is appropriate in most cases."[49] And 99% of doctors are prescribing them for longer than the three-day recommended period as recommended by the CDC.[50] Twenty-three percent prescribe at least a month's worth of opioids and evidence shows that just 30 days of usage can cause brain damage.[51]

39.    Each Defendant used direct marketing and unbranded advertising (*i.e.*, advertising that promotes opioid use generally but does not name a specific opioid) disseminated by seemingly independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use. Defendants advocated the widespread use of opioids for chronic pain even

---

[49] National Safety Council, *NSC Poll: 99% of Doctors Prescribe Highly-Addictive Opioids Longer than CDC Recommends*, 2017 (The NSC was founded in 1913 and chartered by Congress and is a non-profit organization whose mission is to save lives by preventing injuries and deaths at work, in homes, and in the communities through leadership, research, education, and advocacy).
[50] National Safety Council, *NSC Poll, supra.*
[51] National Safety Council, *NSC Poll, supra.*

though it contravened the "cardinal principles of medical intervention – that there be compelling evidence of the benefit of a therapy prior to its large-scale use."[52]

**A.    Defendants Used Multiple Avenues To Disseminate their False and Deceptive Statements about Opioids.**

40.    Defendants spread their false and deceptive statements by (1) marketing their branded opioids directly to doctors treating patients residing in Angelina County and the Angelina County patients themselves and (2) deploying so-called unbiased and independent third parties to Angelina County.

**1. Defendants Spread and Continue to Spread Their False and Deceptive Statements Through Direct Marketing of Their Branded Opioids.**

41.    Defendants' direct marketing of opioids generally proceeded on two tracks.  First, each Defendant conducted advertising campaigns touting the purported benefits of their branded drugs. For example, Purdue spent $200 million promoting and marketing OxyContin in various forms.[53] Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001, including $8.3 million by Purdue, $4.9 million by Janssen, and $1.1 million by Endo.

42.    A number of Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain.  For example, Endo distributed and made available on its website, www.opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like a construction worker and chef, implying that the drug would provide long-term pain-relief and functional improvement.

43.    Purdue also ran a series of ads, called "pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each.

---

[52] Manchikanti, Ex. A, at 2.
[53] Zee, Ex. B, at 2.

One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. Second, each Defendant promoted the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs.

44.     Defendants devoted massive resources to direct sales contacts with doctors. In 2014 alone, Defendants spent $154 million on detailing branded opioids to doctors, including $108 million by Purdue, $34 million by Janssen, and $10 million by Endo.

45.     Defendants sent their sales representatives to prescribers based on their specialties and prescribing habits obtained from sales data through IMS Health. Defendants used this data to monitor, and thereby target, specific physicians through the initial and renewal prescribing rates. To ensure that their sales representatives were properly incentivized, Defendants motivated them through bonuses. In 2001, Purdue paid $20 million in "sales incentive bonuses" to its sales representatives.[54]

46.     Defendants also utilized "influence mapping" to use decile rankings or similar breakdowns to identify high-volume prescribers. The underlying strategy was that detailers would have the biggest sales impact on high-volume prescribers. For example, Endo identified prescribers representing 30% of its nationwide sales volume and planned sales visits three times per month to these physicians. These detailers visited physicians across the nation, including physicians in Angelina County. Defendants also had access to data from IMS Health, which provides Defendants specific details about which medications physicians prescribe and how frequently they do so.  This data was collected from more than 50% of the pharmacies in the United States, which would inform Defendants which doctors to target to convince them to prescribe more

---

[54] Zee, Ex. B, at 2.

opioids or to start prescribing opioids instead of the medications they had been prescribing.

47.     Another manner in which Defendants expanded their sales was to target prescribers in individual zip codes and local boundaries. Defendants would send a detailer based on ease of in-person access and the likelihood of convincing the physician to prescribe a higher number of opioids and at higher doses.

48.     As part and parcel of their detailing of opioids to physicians, Purdue trained its sales representatives to inform physicians that the risk of addiction was "less than one percent" even though studies demonstrated that there was a high incidence of drug abuse associated with prescription opioid use for chronic pain.[55]

49.     As Defendants' marketing efforts grew, they targeted nurse practitioners and physician assistants who, a 2012 Endo business plan noted, were "share acquisition" opportunities because they were more responsive than physicians to details and wrote most of their prescriptions without a physician consult.

50.     Studies demonstrate that visits from sales representatives influence the prescribing practices of residents and physicians by curtailing the prescription of generic drugs and rapidly expanding the prescription of new drugs, such as opioids for chronic pain.[56]

51.     Defendants also paid doctors to serve on speakers' bureaus, to attend programs, and for meals.[57]  In 2017, Dr. Hadland identified some of these payments from pharmaceutical companies to physicians prescribing opioids.[58] It was the first time "industry payments to physicians related to opioid marketing" could be collated because of the "Open Payments program

---

[55] Zee, Ex. B, at 3.
[56] Zee, Ex. B, at 6.
[57] *See* Scott E. Hadland, M.D., M.P.H, M.S., *Industry Payments to Physicians for Opioid Products, 2013-2015*, 107 Am. J of Pub. Health 9, Sept. 2017, attached hereto as Exhibit C.
[58] Exhibit C at 1493.

database" authorized under the "Physician Payments Sunshine Act."[59] Dr. Hadland explained that it was the first large-scale examination of these payments.[60]

52.     One statistic Dr. Hadland gleaned from the data is that nearly 1 in 5 family physicians in 2013, out of 108,971 active family physicians, received an opioid-related payment.[61] After culling through the Open Payments program database, Dr. Hadland concluded that "[f]inancial transfers" from pharmaceutical companies to physicians prescribing opioids "were substantial and widespread and may be increasing in number and value."[62]

53.     Some of the financial transfers most likely involved speaker programs, which provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers.  These speakers gave the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, presenting a script prepared by Defendants.  On information and belief, these presentations conveyed misleading information, omitted material information,  and failed to correct Defendants' prior misrepresentations about the risks and benefits of opioids.

54.     Defendants employed the same marketing plans, strategies, and messages in and around Angelina County, Texas as they did nationwide. Across the pharmaceutical industry, "core message" development is funded and overseen on a national basis by corporate headquarters. This comprehensive approach ensures that Defendants' messages are accurately and consistently delivered across marketing channels and in each sales territory. Defendants consider this high level of coordination and uniformity  crucial to successfully marketing their drugs.

---

[59] Exhibit C.
[60] *Id.* at 1495.
[61] Hadland, Ex. C, at 1494.
[62] *Id.* at 1495.

**2. Defendants Used a Diverse Group of Seemingly Independent Third Parties to Spread False and Deceptive Statements about the Risks and Benefits of Opioids.**

55.     Defendants also deceptively marketed opioids in and around Angelina County through unbranded advertising.  This advertising was ostensibly created and disseminated by independent third parties.  But by funding, directing, reviewing, editing, and distributing this unbranded advertising, Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for treating chronic pain.  Unbranded advertising also avoided regulatory scrutiny because Defendants did not have to submit it to the FDA, and therefore it was not reviewed by the FDA.  But it is illegal for a drug company to distribute materials that exclude contrary evidence or information about the drug's safety or efficacy that "clearly cannot be supported by the results of the study."[63]  Moreover, a drug company cannot compare or suggest that its "drug is safer or more effective than another drug…when it has not been demonstrated to be safer or more effective in such particular by substantial evidence of substantial clinical experience."[64] It is therefore Defendants' responsibility to ensure that not only is its label accurate and complete, but that any and all materials they distribute is accurate and complete.[65]

56.     Defendants' deceptive unbranded marketing often contradicted their branded materials.  For example, Endo's unbranded advertising contradicted its concurrent, branded advertising for Opana ER:

---

[63] 21 C.F.R. § 99.101(a)(4).
[64] 21 C.F.R. § 202.1 (e)(6)(ii).
[65] *See* 21 C.F.R. § 201.56 (providing general requirements for prescription drug labeling); 21 C.F.R. § 314.70(c)(6)(iii)(A-C) (providing for changes to labels that strengthen precautions, warnings, or adverse reactions, as well as statements about drug abuse, dependence, or overdosage); *see also Wyeth v. Levine*, 555 U.S. 555 (2009) (holding that a drug company bears responsibility for the content of its drug label at all times).

| Pain: Opioid Therapy (Unbranded) | Opana ER Advertisement (Branded) |
|---|---|
| "People who take opioids **as prescribed usually do not become addicted**." | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use**." |

57.     Drug companies that make, market, and distribute opioids are generally subject to rules requiring truthful marketing of prescription drugs. A drug company's branded marketing, which identifies and promotes a specific drug, must: (a) be consistent with its label and supported by substantial scientific evidence; (b) not include false or misleading statements or material omissions; and (c) fairly balance the drug's benefits and risks.[66]

58.     This framework ensures that drug companies, which are best suited to understand the properties and effect of their drugs, bear the responsibility of providing accurate information so that prescribers and users can assess the risks and benefits of the drugs.

59.     Defendants did not follow this framework in assisting, creating, and/or distributing third-party publications that included warnings and instructions either mandated by the FDA-required drug labels or that described the risks and benefits known to Defendants. The publications either failed to disclose the risk of addiction and misuse or affirmatively denied the risk of addiction. The publications also "appeared" to be independent third-party materials that had the effect of carrying more weight and credibility to convince physicians that opioids were safe for chronic pain.

      **a.**      **Defendants Utilized Treatment Guidelines to Promote their Deception.**

60.     Defendants used treatment guidelines to normalize the use of opioids for chronic

---

[66] 21 U.S.C. § 352(a); 21 C.F.R. §§ 1.21(a); 202.1(e)(3); 202.1(e)(6).

pain. Doctors, especially general practitioners and family doctors, rely upon treatment guidelines when faced with patients complaining of chronic pain. Scientific literature references treatment guidelines in making its conclusions and third-party payers use treatment guidelines to determine coverage. Even Endo's internal documents indicate that sales representatives discussed treatment guidelines with doctors during individual sales visits.

1.    **The FSMB Wrote or Sponsored Misleading and Deceptive Guidelines.**

61.    Headquartered in Euless, Texas, the Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States.  The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline doctors. The FSMB finances opioid and pain-specific programs through grants from Defendants.

62.    In 1998, the FSMB developed *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain* ("FSMB Guidelines"), which was produced in collaboration with pharmaceutical companies. The FSMB guidelines instructed that opioids were "essential" for the treatment of chronic pain, even as a first prescription option.

63.    A book adapted from the 2007 FSMB guidelines, *Responsible Opioid Prescribing: A Physician's Guide* ("*Opioid Prescribing*"), released March 1, 2009 makes these same claims. *Opioid Prescribing* was supported by a consortium of pharmaceutical companies and Front Groups with an interest in ensuring that "effective" pain management included the use of opioids.

64.    The author of *Opioid Prescribing*, Scott Fishman, M.D., chaired the board and was past president of the American Pain Foundation and served as president of the American Academy of Pain Medicine and served on the board of directors. *Opioid Prescribing* was sponsored by the Alliance of State Pain Initiatives, Federation of State Medical Boards, and the University of

Wisconsin School of Medicine and Public Health.[67]

65.    Dr. Fishman was a paid consultant to Cephalon and Eli Lilly. Dr. Fishman was also a paid consultant, on the Speakers' Bureau, and part of the research support for Endo, Merck, Janssen, Pfizer and Purdue.[68]

66.    *Opioid Prescribing* was designed for continued medical education ("CME") in which a physician had to read the book, complete questions, and fulfill administrative steps to receive 7.5 hours of credit.  The first page of *Opioid Prescribing* specifically states that opioids are the "drugs of choice" and "essential in the treatment of persons with chronic non-cancer pain" and that the CME will inform physicians about the laws and regulations governing the prescribing of opioids for pain control.[69]  It also specifically teaches physicians how to protect their practices from unwarranted federal scrutiny.[70]

67.    *Opioid Prescribing* marketed "[o]pioid analgesics" as the "drugs of choice for the management of moderate to severe pain . . . [which] may be ***essential*** in the treatment of persons with chronic non-cancer pain."[71]  The goal was to "change patient care, medical knowledge, practice-based learning, interpersonal and communication skills, and professionalism . . . ."[72] The argument was that opioids were "underutilized" despite their "effectiveness."[73] The truth, known to Dr. Fishman and Defendants herein, was that using opioids "for other than legitimate medical purposes pose[d] a threat to the individual and society," posed high risks for overdose and addiction, and remained unproven as safe and effective for the long-term treatment of non-cancer

---

[67] Scott M. Fishman, M.D., *Responsible Opioid Prescribing, A Physician's Guide*, FSMB Foundation, Waterford Life Sciences, 2009.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] Fishman *supra,* at i.
[72] *Id.*
[73] Fishman *supra.*

pain.[74]

68.     It was even conveyed to doctors that undertreating pain would be officially disciplined whereas doctors prescribing opioids for chronic pain would not be disciplined. *Opioid Prescribing* described a case in which a physician was sued for "elder abuse" and the jury awarded $1.5 million to the plaintiff as an example of a physician that had been "successfully sued for not treating pain aggressively."[75] *Opioid Prescribing* cautioned that "these legal precedents sound a warning that there are risks associated with under-treating."[76] In actuality, it was a threat that doctors would be punished if they *failed* to prescribe opioids to patients who complained about pain.  That teaching has held true given that according to the National Safety Council, 67% of doctors prescribe opioids, in part, based on a patient's expectations.[77] Moreover, approximately 74% of doctors incorrectly believe morphine and oxycodone are the most effective ways to treat pain even though research shows that over-the-counter medications such as ibuprofen and acetaminophen are the most effective pain relief for acute pain.[78]

69.     Defendants also allayed any concerns doctors may have about patients exhibiting addictive behavior by highlighting the now debunked myth of "pseudoaddiction." Dr. Fishman described pseudoaddiction as a sign that patients were receiving an inadequate dose to obtain pain relief, not as a sign that the patient was exhibiting drug-seeking or addictive behavior.[79]

70.     *Prescribing Opioids* taught physicians that the following signs were evidence of "pseudoaddiction" and *not* drug seeking behavior or signs of addiction so long as prescribing additional opioids resolves the pain:

---

[74] Fishman *supra.* at 6, 9.
[75] *Id.* at 28.
[76] Fishman, *supra.*
[77] National Safety Council, *supra.*
[78] National Safety Council, *supra.*
[79] Fishman, *supra,* at 62.

· Requesting analgesics by name;

· Demanding or manipulative behavior,

· Clock watching;

· Taking opioid drugs for an extended period;

· Obtaining opioid drugs from more than one physician; and

· Hoarding opioids.[80]

71.   Indeed, the types of behaviors that Dr. Fishman posed as "MORE indicative of addiction" included:

· Stealing money to obtain drugs;

· Performing sex for drugs;

· Stealing drugs from others;

· Prostituting others for money to obtain drugs;

· Prescription forgery; and

· Selling prescription drugs.[81]

72.   Certainly by the time a patient is performing sex for drugs, the patient has long been addicted and exhibited addictive behavior that was ignored by physicians at the explicit direction of Defendants. This conclusion is supported by the American Psychiatric Association.

73.   In the DSM-IV, addiction is "manifested" by three (or more) of the following in a 12-month period, including:

a)   Tolerance described as:

A need for markedly increased amounts of the substance to achieve intoxication or the desired effect

*or*

---

[80] Fishman *supra.*
[81] Fishman *supra,* at 63.

        Markedly diminished effect with continued use of the same amount of the substance;

b)      Withdrawal manifested by:

        The characteristic withdrawal syndrome for the substance

        *or*

        The same (or closely related) substance is taken to relieve or avoid withdrawal symptoms;

c)      The substance is taken in larger amounts or over a longer period than intended; and

d)      Spending a great deal of time to obtain the substance, such as visiting multiple doctors or driving long distances.[82]

74.    According to Defendants, as seen in *Prescribing Opioids* and other publications, signs of addiction as defined by the American Psychiatric Association are <u>not</u> signs of addiction, but of pseudoaddiction that justifies taking *more* opioids for a longer period of time.

75.    The reason not to discontinue the use of opioids – indeed, the foundation upon which Defendants built its opioid empire – was "the undertreatment of pain."[83] *Opioid Prescribing* claimed the undertreatment of pain has "been recognized as a public health crisis for decades. The cost of human suffering is immeasurable.  Turning away patients in pain simply is not an option."[84] However, according to Dr. Donald Treater, medical advisor at The National Safety Council: "Opioids do not kill pain; they kill people."[85]

76.    *Prescribing Opioids* acknowledged that by 2005, more than 10 million Americans were abusing prescription drugs, which is more than the combined number of people abusing

---

[82] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., Washington, D.C., American Psychiatric Assoc., 2000.
[83] Fishman, *supra,* at 105.
[84] Fishman, *supra*; *see also id.* at 80 (stating that efforts have been made to reduce the undertreatment or non-treatment of pain in children, the elderly, and in other vulnerable patient populations).
[85] National Safety Council, *supra*.

cocaine, heroin, hallucinogens, and inhalants combined.[86] It also acknowledged that prescription opioids are associated with more overdose deaths than cocaine and heroin combined.[87] Yet the book then cautioned that the "undertreatment" of non-cancer pain was a public health crisis of equal importance that justified more opioid prescribing.

77.     Under the guise of addressing "legitimate cause of undertreated pain" that "patients and advocates have been pushing to address,"[88] Defendants tailored opioid marketing campaigns to affect children and the elderly. The Defendants made significant efforts to promote more opioid prescribing for "untreated or undertreated pain in children, older patients, and in all other vulnerable patient populations."[89]

78.     Defendants also taught physicians that "[p]ain is what the patient says it is" and that a physician "cannot measure or even confirm the pain that a patient is experiencing."[90] As such, "pain remains an untestable hypothesis."[91] Furthermore, "[p]atients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient."[92] All in all, opioids would cure the "pain epidemic" facing Americans. And yet, chronic pain continues to be a problem facing Americans, as well as an opioid epidemic of addiction and death.

79.     A total of 200,000 copies of *Opioid Prescribing*, which Dr. Fishman wrote for the FSMB, has been delivered to U.S. prescribers through 20 state medical boards, including Texas.[93] The FSMB earned approximately $250,000 from the sale. The FSMB website describes the book as the "leading continuing medication education (CME) activity for prescribers of opioid

---

[86] *Responsible Opioid Prescribing*, *supra*, at 6.
[87] *Id.*; *Prescribing Opioids* even recognized that "[b]ehind these figures lie millions of individual stories of personal tragedy:  untimely death, fractures families, shattered dreams and wasted lives."  *Id.* at 7.
[88] *Id.* at 8.
[89] Fishman, *supra*, at 8.
[90] Fishman *supra*, at 14.
[91] *Id.* at 13.
[92] *Id.* at 9.
[93] Scott M. Fishman, M.D., *Listening to Pain*, Oxford Univ. Press, 2012, at 135.

medications."

80.     The guidelines for *Opioid Prescribing* were posted online for use and reliance by physicians throughout America, including but not limited to, those servicing patients in Angelina County. State medical boards even encouraged physicians to buy the book and participate in the CME. The North Carolina Medical Board stated on its website that *Prescribing Opioids* "has been ***widely used and supported*** in the medical and regulatory communities as the leading continuing medical education (CME) activity for prescribers of opioid medications."[94] The website then informs physicians that a CME accompanies the book and directs them to the book and how to claim the CME. The FSMB also hosted free CMEs in Texas, including Houston, Dallas, and Austin, related to extended-release and long-acting opioids.[95] The CME taught physicians the "safe and responsible prescribing of opioid medications and [was] aimed at improving prescriber training and counseling for patients while providing more thorough information on extended-release or long-acting (ER/LA) opioid products on the market."[96]

81.     The impact of *Opioid Prescribing* was even studied through a survey sent to 12,666 licensed Georgia physicians six weeks after receiving the book.[97] The lead author was a member of FSMB.[98] A total of 508 physicians completed the online survey and of those, 82.1% rated the book either "very good" or "good" for improving care for their patients in pain.[99] Almost one-third

---

[94] North Carolina Medical Board, *FSMB Foundation Publishes Second Edition of Prescribing Book*, Forum Newsletter, July 31, 2012; *see also* University of Wisconsin School of Medicine and Public Health, Federation of State Medical Boards, *Responsible Opioid Prescribing – Book Helps Physicians Reduce Risk of Opioid Diversion and Abuse*, April 1, 2009 (describing the book and CME activity).
[95] Texas Medical Board, *Extended-Release and Long-Acting Opioid Analgesics Risk Evaluation and Mitigation Strategy*, www.tmb.state.tx.us.
[96] *Id.*
[97] A. Young, *Physician Survey Examining the Impact of an Educational Tool for Responsible Opioid Prescribing*, J. Opioid Management, Mar-Apr. 2012.
[98] *Id.*
[99] *Id.*

(32.2%) claimed that they intended to make changes to their practice after reading the book.[100] Of note, 42.8% of solo practitioners and 41.6% of primary care providers were more likely to make changes to their practice than doctors in other areas.[101] Of the respondents, 57.7% said that the book was better than others with regard to prescribing opioids and on pain management.[102]

82.    *Opioid Prescribing* was therefore an effective tool that impacted specific doctors and their prescribing practices, as concluded by the study. Specifically, the study provided "insight into which physician population would be the most receptive to the type of information presented in Dr. Fishman's book" and that population was to "first target[] solo and primary care physicians."[103] Defendants found out that their educational efforts "significantly altered prescription practices."[104]

### 2.    The Joint Commission also Spread Deceptive Information.

83.    The Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") is a United States-based non-profit, tax-exempt organization that "accredits and certifies nearly 21,000 health care organizations and programs in the United States."[105] A majority of state governments recognize accreditation from the Joint Commission as a condition of licensure and for receiving Medicaid and Medicare reimbursements.[106] CHI St. Luke's Health Memorial System in Lufkin, Texas, which is one of the main hospitals that feeds into Angelina County, is accredited by and subscribes to the JCAHO.[107]

---

[100] A. Young, *supra.*
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] A. Young, *supra.*
[105] www.jointcommission.org.
[106] Anthony Anonimo, *Poppy Seed. Revealing the Roots of the Opioid Epidemic,* Trinity Mother Frances Health System, 2017, at 65.
[107] www.jointcommission.org.

84.    According to the JCAHO, it "continuously improve[s] health care for the public" and inspires health care organizations "to excel in providing safe and effective care of the highest quality and value."[108] The JCAHO is not independent, but has been influenced by Defendants and those Defendants used the JCAHO as a marketing shill to spread the misleading message that opioids are non-addictive and safe as a first-line analgesic to treat any complaint of pain.

85.    In 2000, the JCAHO published *Pain Assessment and Management: An Organizational Approach* ("*Pain Assessment*"), which was paid for by Purdue and reviewed by June L. Dahl, Ph.D., who has worked for Abbott, Endo, and Purdue.[109]

86.    The JCAHO mission statement on the inside cover page of the book explains that it aspires "to continuously improve the safety and quality of care provided to the public through the provision of health care accreditation and related services that support the performance improvement in health care organizations."[110] One of its big achievements, however, is its endorsements of new pain management standards that underscored Defendants' fraudulent message.

87.    JCAHO, with the help of the American Pain Society ("APS"), a Front Group, loosened pain management standards thereby allowing doctors to prescribe opioids for any complaint of pain. To that end, "[t]he Joint Commission recognize[d] pain as a major, yet largely avoidable, problem . . . .[and] has expanded the scope of its pain management standards, which have been endorsed by the American Pain Society (APS), ***to cover all pain scenarios in accredited health care organizations rather than limiting the scope to end-of-life care***."[111] (Emphasis added.)  On January 1, 2001, Texas incorporated JCAHO pain management standards for hospital

---

[108] www.jointcommission.org.
[109] Joint Commission on Accreditation of Healthcare Organizations, *Pain Assessment and Management*, 2000.
[110] *Pain Assessment*, *supra*.
[111] *Pain Assessment*, *supra*.

and healthcare group accreditation.[112] The Texas Medical Association advertises that *Pain Assessment* "provides practical help in integrating pain assessment and management into organizational systems . . . ."[113]

88.    *Pain Assessment* established the cornerstone of Defendants' message that "all pain scenarios" should be included in pain management practices.[114] It explained that "[p]ain is the most common reason individuals seek medical attention. According to the American Pain Society (APS), 50 million Americans are partially or totally disabled by pain."[115] "The conclusion? Pain is undertreated – despite the availability of effective pharmacologic and nonpharmacologic therapies. Why?"[116]

89.    The answer is on the first page of *Pain Assessment*. There is a chronic pain epidemic. Chronic pain is undertreated. Chronic pain can be managed and even cured with opioids, which are safe and effective, according to *Pain Assessment*. And the JCAHO encouraged organizations to establish standards for recording and responding to patient pain reports and monitoring staff performance and compliance with those standards, so that a physician who did not agree with the JCAHO standards faced the specter of poor performance evaluations.[117]

90.    According to *Pain Assessment*, the reasons healthcare professionals had not used opioids previously included: (1) inadequate knowledge of opioids pharmacology and pain therapy, (2) poor pain assessment practices, (3) unfounded concerns about regulatory oversight, and (4) fear of opioids' side effects such as tolerance and addiction.[118]

---

[112] Texas Medical Association, *JCAHO Pain Management Services*, *available at* https://www.texmed.org/Template.aspx?id=2389&terms=The%20war%20on%20pain.
[113] *Pain Assessment*, *supra*.
[114] *Pain Assessment*, *supra*, at p. 1.
[115] *Id*.
[116] *Id*.
[117] *Pain Assessment*, *supra*, at 41-42.
[118] *Pain Assessment*, *supra*.

91.     *Pain Assessment* asserted that few practitioners received adequate training in pain management in medical school or during their residency resulting in the failure to prescribe opioids or nonsteroidal anti-inflammatory drugs (NSAIDS) on a regular basis leaving patients without pain relief.[119] "[Many] health care professionals lack the knowledge and skills to manage pain effectively, and they fear the effects of treatment."[120] Too few health care systems make pain management a priority.[121] Some clinicians had "inaccurate and exaggerated concerns about addiction, tolerance, respiratory depression, and other opioid side effects, which lead them to be extremely cautious about the use of drugs."[122] Instead of expanding upon and explaining the risks of opioids, *Pain Assessment* states: "***This attitude prevails despite the fact there is no evidence that addiction is a signification issue when persons are given opioids for pain control.***"[123] (Emphasis added). That claim of insignificant addiction risk was false when made and remains false today. Yet it worked as intended to mislead treating doctors, medical staff, and patients into believing opioids could and should be utilized more often. Indeed, 74% of doctors "incorrectly believe morphine and oxycodone" are the "most effective ways to treat pain" even though research shows that over-the-counter pain relievers are the most effective for acute pain.[124] Even worse, 20% of doctors prescribing opioids prescribed at least a month's worth, even though the evidence shows that "30-day use causes brain changes."[125]

92.     Patients also contributed to the pain epidemic by their reluctance to report their pain and to take medications,[126] according to *Pain Assessment*. Doctors were instructed to engage

---

[119] *Pain Assessment*, *supra.*
[120] *Id.* at 3.
[121] *Id.* at 1.
[122] *Pain Assessment*, *supra*, at 4.
[123] *Id.*
[124] National Safety Council, *supra.*
[125] *Pain Assessment*, *supra.*
[126] *Pain Assessment*, *supra*, at 4.

patients in conversations about their pain before prescribing opioids by: (1) asking for pain relief when the pain begins; (2) helping the doctor or nurse assess the pain; and (3) telling the doctor or nurse if the pain is not relieved.[127] Doctors were taught that "[t]he single most reliable indicator of the existence and intensity of pain is the individual's self-report."[128] Indeed, the individual's self-report was to be the **primary** source of information for the doctor and deemed more reliable than the observations of others.[129]

93.     The bombardment of information, instruction, books, pamphlets, seminars, ads, and marketing regarding this "pain epidemic" was so successful that pain has been included as the "fifth vital sign" to be recorded along with the individual's temperature, pulse, respiration, and blood pressure.[130] This strategy was first pitched by the APS to ensure that pain management gained acceptance in the medical community, which it did.[131]

94.     Beginning in 1999, the Veteran's Health Administration began routinely assessing pain as the fifth vital sign in every individual.[132] And according to *Pain Assessment*, the research showed that "when pain assessment information is included in clinical charts, those individuals' analgesics [meaning opioids] are more likely to be increased."[133] In other words, including pain as a fifth element results in not only the prescribing of more opioids, it results in the prescribing of higher doses of opioids.

95.     *Pain Assessment* also framed the role of key opinion leaders ("KOL") as trustworthy people "to evaluate new clinical information, assess new practices, and then determine

---

[127] *Pain Assessment, supra* at 8.
[128] *Id.* at 13.
[129] *Id.*
[130] *Pain Assessment, supra*, at 20.
[131] *Pain Assessment, supra* at 20-21.
[132] *Id.* at 21.
[133] *Pain Assessment, supra.*

their value within the context of the local setting."[134] Doctors were expected to accept KOLs opinions even though KOLs are ***not*** "necessarily innovators or authority figures."[135] KOLs convinced practitioners that their current chronic pain treatment was "outdated, inappropriate, unsupported by research evidence, or no longer accepted by colleagues."[136]

96.     Expert leaders, on the other hand, influenced and implemented protocols with individuals or small groups.[137] These "academic strategies" included "conducting interviews to determine baseline knowledge, stimulating active participation during educational sessions, using concise graphic educational materials, and highlighting or replicating essential messages."[138] Academic detailing was modeled after pharmaceutical detailing practices in which representatives visited physicians to talk about specific medicines, just as Defendants' representatives met with physicians to about opioids.[139] Simply put, *Pain Assessment* was a part of a marketing campaign to plow ground for Defendants to sell more opioids, and the book set forth sophisticated, multi-layered marketing strategies that were most effective in executing the campaign.

97.     If a doctor was not available to prescribe opioids, a nurse would suffice. A nurse specializing in oncology, surgery, critical care, or a nurse anesthetist, as well as a clinical pharmacist, can "serv[e] as role models, provid[e] pain management education and consultation, and act[s] as agents of change."[140] These educational efforts "significantly altered prescription practices."[141]

---

[134] *Pain Assessment, supra,* at 24.
[135] *Id.*
[136] *See id.* at 25.
[137] *Id.*
[138] *Pain Assessment*, *supra*, at 25.
[139] *Pain Assessment*, *supra.*
[140] *Pain Assessment*, *supra.*
[141] *Id.*

98.     To succeed in prescribing opioids for chronic pain, Defendants had to create a market for chronic pain. To do so, Defendants literally encouraged patients not to tolerate pain and to fear pain *more* than opioid addiction.[142] Physicians and their staff were encouraged to educate their patients about "effective pain management," which included the use of opioids.[143]  *Pain Assessment* explained research that showed Americans would rather bear pain because they were afraid of "addiction, dependence on drugs, and tolerance to medications," which affected not only the patient's willingness to report pain, but to use adequate amount of opioids to control the pain.[144] A patient's reluctance to take opioids out of fear they would not function normally meant that the problem was "underreported" and the pain went "untreated."[145]

99.     Consequently, the answer was to inform and educate the patient that unrelieved pain is harmful and that he or she should communicate pain.[146] *Pain Assessment* instructed the use of pain assessment instruments, including pain intensity scales, to describe the nature of the pain and stressed that the "most reliable indicator of pain" was the individual's self-report.[147] Once the patient reported the pain, the physicians and staff were taught to tell the patient about opioids, explain that opioids were safe and effective, describe the name, dosage, and duration of the opioid therapy, and explain the risk of pain versus the importance of pain management.[148]

100.    To ensure that patients self-reported pain prior to hospital visits, *Pain Assessment* encouraged health care systems to provide individuals and families with pain management information ***prior*** to being admitted.[149] And health care systems were told to leave individuals and

---

[142] *Pain Assessment, supra* at 33.
[143] *Id.*
[144] *Id.*
[145] *Pain Assessment, supra*, at 33.
[146] *Id.* at 35.
[147] *Pain Assessment, supra.*
[148] *Id.*
[149] *Pain Assessment, supra* at 36.

family members with audio and videotapes to watch and listen to about the "importance" of "pain relief" so that they truly understood the message – that is, if you have "pain," tell us and we will provide opioids.

101.     The JCAHO was not independent and did not improve the safety or quality of healthcare. Instead it was hijacked by Defendants to standardize pain management criteria that required the use of opioids for chronic pain. The JCAHO was merely a pawn in the Defendants' larger game.

102.     Like other books and pamphlets used by Defendants to spread their "message," *Pain Assessment* was distributed throughout the nation and in Texas. As of today, anyone can buy a used copy of *Pain Assessment* on Amazon.com for $26.48 plus $5.99 in shipping costs from a seller in Texas.

   **b.     Key Opinion Leaders (KOLs) were another Means of Disseminating False Information.**

103.     Defendants also sponsored KOLs, a small circle of doctors who, upon information and belief, were selected, funded, and elevated by Defendants because they publicly supported dispensing opioids more widely and indiscriminately.

104.     Defendants paid KOLs to serve as consultants or to appear on their advisory boards and to give talks or present CMEs, and Defendants' support helped these KOLs become respected industry experts. As they rose to prominence, these KOLs promoted the benefits of opioids to treat chronic non-cancer pain, repaying Defendants by advancing their marketing goals.

105.     KOLs wrote articles and books, gave speeches, and taught CMEs to promote the utilization of opioids to treat moderate non-cancer pain. Defendants created opportunities for KOLs to participate in "studies" and write papers for the purpose of advancing Defendants' marketing theme: opioids should be dispensed regularly and perpetually to treat a broad array of

pain complaints.

106.    Defendants' KOLs also served on committees that developed treatment guidelines that strongly encourage using opioids to treat chronic pain, and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. Defendants were able to direct and exert control over each of these activities through their KOLs.

107.    Pro-opioid doctors are one of the most important avenues that Defendants use to spread their false and deceptive statements about the risks and benefits of long-term opioid use. Defendants know that doctors rely heavily and less critically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for using opioids for chronic pain.

108.    Different Defendants utilized many of the same KOLs. Two of the most prominent are described below.

### 1. Russell Portenoy

109.    Dr. Russell Portenoy, former Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York, is one example of a KOL who Defendants identified and promoted to further their marketing campaign. Dr. Portenoy received research support, consulting fees, and honoraria from Endo, Janssen, and Purdue (among others), and was a paid consultant to Purdue.

110.    Dr. Portenoy was instrumental in opening the door for the regular use of opioids to treat chronic pain. He served on the American Pain Society ("APS")/American Academy of Pain Medicine ("AAPM") Guidelines Committees, which endorsed the use of opioids to treat chronic pain, first in 1997 and again in 2009.  He was also a member of the board of the American Pain Foundation ("APF"), an advocacy organization almost entirely funded by Defendants.

111.     Dr. Portenoy also made frequent media appearances promoting opioids. He appeared on *Good Morning America* in 2010 to discuss using opioids long-term to treat chronic pain.  On this widely-watched program, broadcast in Texas and across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted."[150]

112.     Perhaps realizing that "[m]ore than 16,000 people die from opioid overdoses every year," Dr. Portenoy is now having "second thoughts" about the "wider prescription" of drugs like Vicodin, OxyContin, and Percocet.[151] Dr. Portenoy later admitted in a 2010 videotaped interview that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."[152] According to Dr. Portenoy,  because the primary goal was to "destigmatize" opioids, he and other doctors promoting them  overstated their benefits and glossed over their risks.

113.     Dr. Portenoy put doctors' fear that opioids were dangerous and addictive, and meant only for cancer patients, to rest by arguing that they could be taken safely for months, even years, by patients with chronic pain.[153] Dr. Portenoy, as well as other doctors making the speaker rounds, asserted that "[l]ess than 1% of opioid users became addicted, the drugs were easy to discontinue and overdoses were extremely rare in pain patients."[154]

114.     Dr. Portenoy also conceded that "[d]ata about the effectiveness of opioids does not exist."[155] Dr. Portenoy candidly stated: "Did I teach about pain management, specifically about

---

[150] Good Morning America television broadcast, ABC News, Aug. 30, 2010.
[151] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, WALL ST. J., Dec. 17, 2012, attached hereto as Exhibit D.
[152] *Id.*
[153] Catan, *supra*.
[154] Catan, *supra*.
[155] Catan, *supra*.

opioid therapy, in a way that reflects misinformation? Well…I guess I did."[156]

115.    Before his moment of clarity, Dr. Portenoy co-authored a guide to publicize the benefits of opioids for chronic pain, which was paid for by an unrestricted education grant from Endo, titled *A Clinical Guide to Opioid Analgesia* ("*Opioid Analgesia*").[157] *Opioid Analgesia* reiterated that opioids are "absolutely necessary" for pain relief.[158]

116.    Although *Opioid Analgesia* claimed "to help clinicians make practical sense of the varied and often conflicting pharmacologic, clinical and regulatory issues to promote the most healthful outcomes possible for patients in pain,"[159] the reality was that it expressed regret that federal and state governments had passed controlled substances acts to stem addiction, which had curtailed the prescription of opioids.[160] This regulation, explained *Opioid Analgesia*, "contributed to the underuse of opioid medications."[161]

117.    As with all other books, guidelines, and CMEs promoted by Front Groups and KOLs, *Opioid Analgesia* establishes the absolute need for opioids in light of the chronic pain epidemic. "Because pain is inherently subjective, patient self-report is the 'gold standard' for assessment."[162] If there's no discernible reason for the pain, then it should be characterized as "idiopathic."[163] Regardless of how the pain is characterized, the solution, per *Opioid Analgesia,* is opioids.

118.    "While opioid analgesics are controlled substances, they are also essential medication and are absolutely necessary for relief of pain."[164] "Opioid analgesics should be

---

[156] Catan, *supra.*
[157] Perry G. Fine, M.D. and Russell K. Portenoy, M.D., *A Clinical Guide to Opioid Analgesia*, McGraw-Hill, 2004.
[158] *Id.* at 2.
[159] *Id.* at 3.
[160] *Id.*
[161] *Id.* at 6.
[162] Fine, *supra,* at 34.
[163] Fine, *supra,* at 35.
[164] *Id.* at Table 1.

accessible to all patients who need them for relief of pain."[165] Brushing away any concerns about addiction, *Opioid Analgesia* posits that "[a] patient who has reached middle age without developing compulsive use behaviors to potentially abusable drugs, including alcohol and nicotine, appears to be at a very low risk" of addiction, especially if "there is no family history of addiction."[166]

119.    Underplaying the risks of addiction, *Opioid Analgesia* falsely claimed that "[o]verall, the literature provides evidence that the outcomes of the drug abuse and addiction are rare among patients who receive opioids for a short period (i.e., for acute pain) and among those with no history of abuse who receive long-term therapy for medical indications."[167] Even while admitting there is "very little information about the risks of misuse, abuse, or addiction among different opioid-treated populations" and even admitting the "[w]hen misused, opioids pose a threat to society,"[168] Defendants' intentionally marketed opioids as effective and safe for treatment of chronic pain and summed up the risk of addiction for short-term therapy as "rare."[169]

120.    Of course when addiction is as narrowly defined as it is in the books, CMEs, and guidelines that Defendants publishes, the risk of addiction would be termed as "rare." The behaviors cited in *Opioid Analgesia* as "probably more suggestive" of addiction included:

·    Selling prescription drugs;

·    Forging prescriptions;

·    Stealing or "borrowing" drugs from others;

·    Injecting or inhaling (snorting, smoking) oral formulations; and

[165] Fine, *supra.*
[166] *Id.* at 21.
[167] *Id.*
[168] *Id.* at 31, 2.
[169] Fine, *supra*, at 34.

· Obtaining the prescription drugs from nonmedical sources.[170]

121. Whereas the following behaviors are "probably less suggestive" of addiction:

· Aggressive complaining about the need for more drug;

· Drug hoarding during periods of reduced symptoms;

· Requesting specific drugs; and

· Using the drug, without approval, to treat another symptom.[171]

122. Instead of these behaviors being symptoms of possible addiction, Dr. Portenoy terms these behaviors as a "phenomenon" termed "pseudoaddiction."[172] Pseudoaddiction allows physicians to discount these behaviors because "they are driven by desperation surrounding unrelieved pain" and are "eliminated by measures that relieve the pain, such as an increase in medication."[173] Instead of treating the "less suggestive" symptoms for what they are – signs of addiction.

123. *Opioid Analgesic* was a success for Defendants in that it has been and continues to be used extensively in CMEs, pamphlets, and reading lists for physicians looking for information regarding opioids. For example, *Opioid Analgesia* was cited ***just last year*** in a presentation at the University of North Texas College of Pharmacy on April 28, 2017, entitled *Adverse Drug Events Associated with Opiate-Based Pain Management* (Emphasis added). It has also been listed as a reference for a CME entitled *The Management of Opioid-Induced Constipation* published by the University of North Texas Health Science Center, which was valid for CME from May 2009 to May 2010. Finally, the book was included in the suggested reading list for a seminar entitled *When Opioids Are Indicated for Chronic Pain* presented on March 26, 2011, in Houston, Texas.

---

[170] Fine, *supra,* at 85.
[171] *Id.*
[172] *Id.* at 35.
[173] *Id.*

### 2.  Lynn Webster

124.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise-unknown pain clinic in Salt Lake City, Utah.  Dr. Webster was President in 2013 and is a current board member of AAPM, a Front Group that ardently supports using opioids for chronic pain.  He is a Senior Editor of *Pain Medicine*, the same journal that published Endo special advertising supplements recommending Opana ER.  Dr. Webster authored numerous CMEs sponsored by Endo and Purdue while he was receiving significant funding from Defendants.

125.    In 2011, Dr. Webster presented a program via webinar sponsored by Purdue titled *Managing Patient's Opioid Use:  Balancing the Need and the Risk*.  Dr. Webster recommended using risk screening tools, such as urine testing and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths," which was available to and  was intended to reach doctors treating Angelina County residents.

126.    Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," the notion that addictive behaviors should be seen not as warnings, but as indications of undertreated pain. In Dr. Webster's description, the only way to differentiate the two was to *increase* a patient's dose of opioids.  As he and his co-author wrote in a book entitled *Avoiding Opioid Abuse While Managing Pain* (2007), a book that is still available online, when faced with  signs of aberrant behavior, increasing the dose "in most cases . . . should be the clinician's first response."  Endo distributed this book to doctors.

127.    Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients  more medication."[174] Dr. Webster also

---

[174] John Fauber & Ellen Gabler, *Networking Fuels Painkiller Boom*, MILWAUKEE WISC. J. SENTINEL, Feb. 19, 2012.

admits that "[i]t's obviously crazy to think that only 1% of the population is at risk for opioid addiction."[175]

### c.    Front Groups Affirmed Defendants' Falsities.

128.    Defendants entered into arrangements with seemingly unbiased and  independent patient and professional organizations to promote opioids for treating  chronic pain. Under Defendants' direction and control, these "Front Groups" generated treatment guidelines, unbranded materials, and programs that favored using opioids for chronic non-cancer pain.  They also assisted Defendants by responding to negative articles, by advocating against  regulatory changes that would limit prescribing opioids in accordance with the scientific  evidence, and by conducting outreach to vulnerable patient populations targeted by Defendants.

129.    These Front Groups depended on Defendants for funding and, in some cases, for survival. Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, Defendants made sure these Front Groups would generate only the messages Defendants wanted to distribute. Even so, the Front Groups held themselves out as independent and as serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

130.    Defendants Endo, Janssen, and Purdue utilized many Front Groups, including many of the same ones.  Several of the most prominent are described below, but there  are many others, including the American Pain Society ("APS"), American Geriatrics Society  ("AGS"), the Federation of State Medical Boards ("FSMB"), American Chronic Pain  Association ("ACPA"), American Society of Pain Education ("ASPE"), National Pain  Foundation ("NPF") and Pain & Policy Studies Group ("PPSG").

---

[175] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, WALL ST. J., Dec.17, 2012.

### 1. American Pain Foundation ("APF")

131.    APF was founded in 1997 and professed to be an independent non-profit 501(c)3 organization "serving people with pain through information, advocacy and support."[176] It had a membership of "close to 100,000 and growing" in 2010 and claimed to be the "largest advocacy group for people with pain."[177] The APF lauded its participation in "close to 100 policy activities," which included testifying at legislative hearings to securing state and local proclamations for Pain Awareness Month.[178]

132.    APF, however, as the most prominent of Defendants' Front Groups, received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Endo alone provided more than half that funding; Purdue was next at $1.7 million. Despite the influx of funds from pharmaceutical companies, APF claimed to be an independent patient advocacy group.

133.    In 2009 and 2010, more than 80% of APF's operating budget came from pharmaceutical industry sources.  Including industry grants for specific projects, APF received about $2.3 million from industry sources out of total income of about $2.85 million in 2009.  In 2010, Endo paid APF more than $1 million and Purdue paid APF between $1 million and 4.9 million.[179] By 2011, APF was entirely dependent on incoming grants from Purdue, Endo, and others to avoid using its line of credit.  One of its board members, Russell Portenoy, explained the lack of funding diversity was one of the biggest problems at APF.

---

[176] American Pain Foundation, *Treatment Options: A Guide for People Living with Pain*, www.painfoundation.org; *see also 2010 Annual Report*, American Pain Foundation.
[177] *2010 Annual Report, supra.*
[178] *Id.*
[179] *2010 Annual Report, supra.*

134.     APF issued education guides for patients, reporters, and policymakers that recommended opioids for chronic pain while trivializing their risks, particularly the risk of addiction. Its *Pain Community News*, an "esteemed" quarterly newsletter, had a print circulation of more than 68,000 plus additional online readers.[180] Its monthly electronic newsletter, *Pain Monitor*, was a monthly newsletter that provided links to pain-related news and research.[181] The APF also provided "patient representatives" for Defendants' promotional activities, including Purdue's *Partners Against Pain[182]* and Janssen's *Let's Talk Pain.[183]*

135.     In one of its publications, *Treatment Options: A Guide for People Living with Pain*, ("*Treatment Options*"), APF recognized contributions from Cephalon and Purdue.[184] *Treatment Options* was reviewed by Scott Fishman, M.D., Vice Chairman of the APF Board of Directors, and Russell Portenoy, M.D., a Member of the APF Board of Directors and also a KOL.[185] *Treatment Options* set the stage for prescribing opioids by explaining their underuse despite their benefits.[186] It dismissed the risk of addiction with the rhetoric that physical dependence was nothing more than symptoms or signs of withdrawal that occurred when opioids were stopped suddenly or the dose lowered too quickly.[187]

136.     *Responsible Opioid Prescribing* and *The War on Pain* both had a tremendous impact on doctors' prescribing habits. In 2000, Scott Fishman, M.D., who served on APF's board, co-authored *The War on Pain* ("*Pain War*") as general authoritative information about pain

---

[180] *2010 Annual Report, supra* at 2.
[181] *Id.* at 2.
[182] In its "Partner against Pain" website, Purdue claimed that the risk of addiction from the use of OxyContin in treating "chronic non-cancer pain" was "extremely small"; *see also* Zee, Ex. B, at 3.
[183] *Let's Talk Pain* was a "coalition effort that focus[ed] on supporting positive patient-provided communications" regarding pain.
[184] *Treatment Options, supra,* at ii.
[185] *Id.* at iv.
[186] *Treatment Options, supra,* at 11.
[187] *Id.* at 14 (referring to symptoms such as sweating, rapid heart rate, nausea, diarrhea, goosebumps, and anxiety).

medicine."[188]

137.  *Pain War* seeks new specialties in which opioids can be prescribed for chronic pain. Rheumatologists treating arthritis have been overlooked because they were more prone to prescribe NSAIDS instead of opioids, such as morphine.[189] But such "outdated ideas about addiction and concerns about social stigmas" need to evolve because opioids offer "substantial relief" with "less severe long-term side effects than chronic anti-inflammatories."[190]

138.  *Pain War* advocates for physical dependence to opioids, and equates withdrawal symptoms from opioid drugs to that of cessation of coffee drinking. A "pain patient who is dependent on opioids finds life restored," the book advises, and then explains that removing a patient from opioids causes physical, not psychological, consequences, like quitting *coffee*.[191] Addiction to opioids is treated as a "phobia" or "notion" that "using opioids" are "always addictive."[192]

139.  *Pain War* censures the failure to prescribe opioids and even suggests that such failure is a criticism of the patient. For example:

> Doses tend to be too low, the right narcotic preparation tends to be avoided, and the prescribing period is often too short. Medicine's reluctance to use appropriate doses of opioid drugs gives patients the wrong message – their pain isn't that important, they are not trustworthy, they may be addicts, they are bad people if they take drugs even if they are prescribed.[193]

140.  *Pain War* was distributed across the nation, and sold in Texas, as evidence by a seller from Texas offering the used book for $9.56 plus $5.99 in shipping costs on Amazon.com.

---

[188] Scott Fishman, M.D., with Lisa Berger, *The War on Pain,* First Quill, 1st ed., 2000.
[189] *Id.* at 154.
[190] Fishman, *War on Pain*, *supra,* at *155.*
[191] *Id.* at 187.
[192] *Id.* at 185.
[193] Fishman, *War on Pain*, *supra.*

141.    As late as 2008, the APF was still relaying the same message. In *A Reporter's Guide: Covering Pain and Its Management* ("*Reporter's Guide*"), the APF extolled that "[t]he person with pain is the authority on the existence and severity of his/her pain. The self-report is [the] most reliable indicator."[194] The *Reporter's Guide* referred to pain as a health crisis and concluded that it affected more Americans than "diabetes, heart disease and cancer combined."[195]

142.    Yet APF, Defendants' Front Group also admitted that:

·    71% of people abusing prescription pain relievers received them from a friend or family member without a prescription;

·    Approximately 2.2 million Americans abused pain medication for the first time in 2006; and

·    Between 1992 and 2002, reported abuse by teenagers increased by 542%.[196]

143.    Even though Defendants knew about the risks involved in prescribing opioids or ingesting opioids, they continued to disseminate a story about a "pain epidemic" that could be treated only through the use of opioids. Even a 542% increase in abuse by teenagers in the United States in the span of ten years did not make Defendants change their marketing strategy or otherwise modify their educational or promotional materials concerning the risks associated with the use of opioids.

144.    In addition to these publications, APF also engaged in a significant multimedia campaign – through radio,  television, and the internet – to educate patients about their "right" to pain treatment, namely  opioids. APF's local and national media efforts resulted in 1,600 media stories on pain in 2010, which was an increase of 1,255% from 2009.[197] APF surmised that it

---

[194] American Pain Foundation, *A Reporter's Guide: Covering Pain and Its Management*, Oct. 2008, at 1, attached hereto as Exhibit E.
[195] *Id.* at 29.
[196] *Reporter's Guide*, Ex. E, at 29.
[197] *Reporter's Guide*, *supra*, at 15.

reached more than 600 million people with information and education related to pain.[198] All of the programs and materials were available nationally and were intended to reach patients and consumers in Angelina County.

145.     APF's website was visited by nearly 275,000 people in 2010 and a National Pain Foundation was expected to be complete in 2011.[199] In May 2012, the U.S. Senate Finance Committee began investigating the financial ties between Front Groups and trade organizations, such as APF and the FSMB, and the opioid manufacturers. This investigation not only caused damage to APF's credibility but caused Defendants to cease its funding.

146.     The Senate Finance Committee intended to investigate whether pharmaceutical companies were responsible for the opioid epidemic by "promoting misleading information about the drugs' safety and effectiveness."[200] The Senate Finance Committee was concerned that a "network of national organizations and researchers with financial connections to the makers of narcotic painkillers . . . helped create a body of dubious information 'favoring opioids' that can be found in prescribing guidelines, patient literature, position statements, books and doctor education courses."[201]

147.     The Senate Finance Committee was especially concerned that "[a]mong the FSMB's educational initiatives has been the development and distribution of a guidebook intended to help physicians recognize the risk of opioids and follow responsible and safe prescribing standards."[202] (Emphasis in original.) Hence, Dr. Fishman and his book *Opioid Prescribing: A Physician's Guide*, the first edition of which was released in 2007 and later accredited by the University of Wisconsin

---

[198] *Reporter's Guide*, *supra*.
[199] *2010 Annual Budget*, *supra*, at 6
[200] *See* Letter to Dr. Humayun J. Chaudhy dated May 8, 2012 from Charles E. Grassley and Max Baucus, at p. 2.
[201] *Id. quoting* Milwaukee Journal Sentinel/MedPage Today, *Follow the Money: Pain, Policy, and Profit*, Feb. 19, 2012, *available at* at http://medpagetoday.com/Neurology/PainManagement/31256.
[202] Chaudhy Letter, *supra*, at 5.

School of Medicine and Public Health, was at the center of the investigation.[203]

148.    The Senate Finance Committee asked for any grants or financial transfers used to produce the book, the revenue generated from the sale of the book, each state that distributed the book, and the names of any people or organization involved in writing or editing the book.[204]

149.    Within days, APF's board voted to dissolve the organization and it ceased to exist. The FSMB responded to the Senate Finance Committee's inquiry, however, and agreed that "the abuse and misuse of opioids is a serious national problem."[205] Dr. Chaudhy, speaking on behalf of the FSMB, acknowledged that "prescription drug abuse and related deaths has grown at an alarming pace in the United States."[206] Dr. Chaudhy described Dr. Fishman, the author of *Opioid Prescribing*, as "one of the nation's leading experts in pain medicine."[207]

150.    *Opioid Prescribing* was released from 2007 through January 2012, was distributed in each of the 50 states, including Texas, and supported in the medical community as an educational resource for doctors.[208] The book is still being sold today. For example, a used copy of the book is being sold on Amazon.com by Delta River Books, located in Texas, for $51.49 plus $3.99 in shipping. Dr. Fishman also toured and gave keynote speeches about *Opioid Prescribing*. For example, Dr. Fishman presented the keynote at the Federation of State Medical Board Meeting in Fort Worth, Texas on April 28, 2012, which lasted three days.[209] The book was also used extensively by state regulators to make safe and responsible decisions about prescribing opioids.[210]

---

[203] Chaudhy Letter, *supra.*
[204] *Id.* at 3.
[205] Letter to Max Baucus and Charles Grassley dated June 8, 2012 from Humayun J. Chaudhy, DO, FACP, at 1.
[206] Chaudhy Letter, *supra*, at 1.
[207] *Id.* at 5.
[208] *Id.*
[209] U.C. Davis, *Fishman Gives Keynote at Federation of State Medical Boards Meeting*, May 1, 2012, *available at* https://ucdmc.ucdavis.edu/publish/news/newsroom/6523.
[210] Chaudhy, *supra*, at 5, 17.

151.    As described herein, Dr. Fishman and his book was partly funded by Endo, Purdue, and Abbott among others as evidenced in the response. In 2004, Purdue paid $87,895 in the form of a grant to the FSMB to update the FSMB *Model Guidelines for the Use of Controlled Substances in the Treatment of Pain*, along with other objectives related to opioids.[211] In 2005, Purdue paid $244,000 to FSMB and in 2006, Purdue paid $207,000 to FSMB for the continuation of the same project.[212] In 2008, Endo and Purdue each paid $100,000 in the form of a grant for the distribution of *Responsible Opioid Prescribing*.[213] Thus, from 2000-2012, Purdue paid $734,505.06 and Endo paid $411,620.00 to the FSMB and FSMB Foundation.

152.    Dr. Chaudhy's response merely underscored Defendants' role, through KOLs and Front Groups, in controlling the message these groups conveyed about opioids.

### 2.  American Academy of Pain Medicine ("AAPM")

153.    The American Academy of Pain Medicine, with Defendants' assistance, prompting, involvement, and funding, issued treatment guidelines and sponsored and hosted  medical education programs essential to Defendants' deceptive marketing of chronic opioid  therapy.

154.    AAPM received over $2.2 million in funding since 2009 from opioid manufacturers. AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate.  The benefits included allowing members to  present educational programs at off-site dinner symposia in connection with AAPM's marquee  event – its annual meeting held in Palm Springs, California, or other resort locations.  AAPM  describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and  marketing staff to meet

---

[211] Chaudhy Letter, *supra*, at 11.
[212] *Id.* at 11-12.
[213] *Id.* at 12.

with AAPM executive committee members in small settings. Defendants Endo, and Purdue were members of the council and presented deceptive programs to doctors who attended this annual event.

155.     AAPM is viewed internally by Endo as "industry friendly," with Endo advisors and speakers among its active members.  Endo attended AAPM conferences, funded its CMEs, and distributed its publications.  The conferences sponsored by AAPM heavily emphasized sessions on opioids – 37 out of roughly 40 at one conference alone. AAPM's presidents have included top industry-supported KOLs Perry Fine, Russell Portenoy, and Lynn Webster. Dr. Webster was even elected president of AAPM while under a DEA investigation.  Another past AAPM president, Dr. Scott Fishman, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed."[214]

156.     Defendants influenced AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization. AAPM's staff understood they and their industry funders were engaged in a common task – propagate a "pain epidemic" and solve it by teaching that opioids were safe and effective for treating chronic pain.

157.     In 1997, AAPM and the American Pain Society jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed there was a low risk that patients would become addicted to opioids.  The co-author of the statement, Dr. Haddox, was a paid speaker for Purdue at the time.  Dr. Portenoy, Defendants' KOL, was the sole consultant. The consensus statement remained on AAPM's website until 2011.

---

[214] Interview by Paula Moyer with Scott M. Fishman, M.D., Professor of Anesthesiology and Pain Medicine, Chief of the Division of Pain Medicine, Univ. of Cal., Davis (2005), *available at* http://www.medscape.org/viewarticle/500829.

158.     AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines") and continued to recommend using opioids to treat chronic pain.  Fourteen of the 21 panel members who drafted the AAPM/APS Guidelines, including KOLs Dr. Portenoy and Dr. Perry Fine of the University of Utah, received support from Janssen, Endo, and Purdue.

159.     The 2009 Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories. One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because he was concerned the 2009 Guidelines were influenced by contributions that drug companies, including Defendants, made to the sponsoring organizations and committee members. These AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids. The Guidelines have been cited 732 times in academic literature, were disseminated in and around Angelina County during the relevant time period, are still available online, and were reprinted in the *Journal of Pain*.

**B.     Defendants' Marketing Scheme Misrepresented the Risks and Benefits of Opioids.**

160.     To convince doctors and patients in Angelina County that opioids can and should be used to treat chronic pain, Defendants had to convince them that long-term opioid use is non-addictive, safe, and effective.  Knowing they could do so only by deceiving those doctors and patients about the risks and benefits of long-term opioid use, Defendants made claims that were not supported by, and were contrary to, the scientific evidence. Defendants have not corrected their misrepresentations.

161.     Defendants also deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risks of addiction and overdose, through a series of misrepresentations that have since been conclusively debunked by numerous published studies and the magnitude of human misery caused by Defendants' deceptions. These misrepresentations – which are described below – reinforced each other and created the dangerously misleading impression that opioids are the best treatment option for any recurrent moderate pain because: (1) only a miniscule number of patients, if any, would become addicted; (2) all patients with a substantial risk of becoming addicted to opioids could be readily identified; (3) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (4) the use of higher opioid doses do not escalate risk of addiction or overdose; and (5) "abuse-deterrent" opioids are reliably safe and effective for perpetual use.  Defendants still espouse these misrepresentations today.

162.     *First*, Defendants falsely claimed the risk of addiction is low and unlikely to develop when opioids are prescribed, as opposed to those obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids.[215] For example:

a)     Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which instructed that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft.  This publication is still available online;

b)     Endo sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted."  Another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them.";

c)     Endo distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that: "Most health care providers

---

[215] *See, e.g.,* Manchikanti, Ex. A, at 22 (blaming adverse consequences on abuses and overuses instead of appropriately blaming opioids used as directed).

who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website, www.opana.com;

d)     Janssen reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain.";

e)     Janssen currently runs a website, Prescriberesponsibly.com (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated";

f)     Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]." This publication is still available online; and

g)     Detailers for Purdue, Endo, and Janssen in and around Angelina County minimized or omitted any discussion with doctors of the risk of addiction; misrepresented the potential for opioid abuse with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

163.    These claims contradict empirical evidence. As noted by the CDC, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])."[216] The CDC has explained that "[o]pioid pain medication use presents serious risks, including…opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."[217] In fact, as many as "1 in 4 patients receiving long-term opioid therapy in primary care settings struggle with opioid use disorder."[218] Among the 12 recommendations by the new CDC guidelines to improve patient care and safety is that non-opioid therapy is preferred for chronic pain unless there is active cancer or it is for palliative

---

[216] Centers for Disease Control and Prevention, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States 2016*, Mar. 18, 2016.
[217] *Id.*
[218] *Id.*

and end-of-life care.[219]

164.    Defendants' long-standing claims that opioid addiction and overdose are anomalies largely attributable to patient abuse of the drug, are demonstrably false. Indeed, the majority of cases "involving injury and death occur in people using opioids *exactly* as prescribed . . ."[220]

165.    In 2010, a study addressed the rates of opioid overdose with patients receiving average prescribed daily opioids versus patients receiving medically prescribed chronic opioid therapy.[221] The patients included those receiving three-plus opioid prescriptions within 90-days for chronic non-cancer pain between 1997 and 2005.[222] Patients who received 50-99 mg had a 3.7-fold increase in overdose risk (95% C.I. 1.5, 9.5) and a 0.7 annual overdose rate.[223]

166.    The authors determined that even though opioids provide some pain relief for chronic pain, balancing the long-term risks with the benefits was still "poorly understood."[224] Those patients who had not received opioids lately had a lower risk of overdose, however, than patients consistently receiving opioids at a low dosage.[225]

167.    The authors pointed to previous studies that indicated a rise in opioid-related overdoses with an increase in prescribing opioids for non-cancer pain, but the belief that such phenomenon was caused by patients obtaining opioids from non-medical sources.[226] This study, proves for the first time, however, that the risk of overdose is directly linked to the prescription and use of medically prescribed opioids.[227]

---

[219] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[220] Manchikanti, Ex. A, at 22.
[221] Kate M. Dunn, Ph.D., Kathleen W. Saunders, J.D., *Overdose and Prescribed Opioids:  Association among Chronic Non-Cancer Pain Patients*, Ann. Intern. Med., Dec. 10, 2010, at 2.
[222] *Id.*
[223] *Id.*
[224] *Id.*
[225] Dunn, *supra,* at 6.
[226] *Id.* at 7.
[227] *Id.*

168.     The authors of a Washington study in which the authors obtained Washington Medicaid data from the Washington Heath Care Authority reached a similar conclusion.[228] The opioid prescription claim history was examined for each "opioid poisoning" for the months that enrollees received Medicaid FFS prescription benefits.[229] The authors concluded that a large percentage of opioid poisonings happened at lower prescribed doses and in individuals who were not considered chronic users.[230]

169.     The authors noted that previous opioid guidelines focused on opioid doses above 80-120 mg/d MED even though previous studies showed risk of opioid deaths and poisonings at much lower doses and that most non-methadone opioid poisonings had been prescribed below these guidelines levels.[231] The authors concluded that only a small percentage of patients are prescribed opioids at a dosage greater than 120 mg/d MED, but that a large percentage of the opioids poisonings have been occurring in patients taking lower doses and in patients not considered chronic users.[232] Overdoses were therefore occurring in patients prescribed opioids for chronic non-cancer pain at increased rates and the overdose risk increased with an average prescription dose.[233] The guidelines and other educational material regarding opioids need to be changed to reflect the opioid poisoning among this population.[234]

170.     In fact, "[t]he majority of deaths (60%) occur in patients when they are given prescriptions based on prescribing guidelines by medical boards with 20% of deaths in low dose opioid therapy . . . ."[235] The way to cure the "crisis of opioid use in the United States" is to change

---

[228] Deborah Fulton-Kehoe, Ph.D., *Opioid Poisonings in Washington State Medicaid:  Trends, Dosing, and Guidelines*, 53 Medical Care 8, Aug. 2015, at 680.
[229] *Id.*
[230] *Id.*
[231] *Id.* at 683.
[232] *Id.* at 684.
[233] Fulton-Kehoe, *supra.*
[234] *Id.*
[235] Manchikanti, Ex. A, at 1.

"inappropriate prescribing patterns, which are largely based on a lack of knowledge, perceived safety, and inaccurate belief of undertreatment of pain."[236]

171.   Another study found that approximately 60% of overdoses occur in medical users of opioids prescribed by a single physician to manage chronic pain.[237] Non-medical users comprise only a statistical minority of opioid overdoses.[238]

172.   Scientific evidence underscores the conclusion that low-dose opioid therapy for chronic pain, opioids taken as prescribed, opioids obtained from a single doctor, and opioids prescribed pursuant to prescribing guidelines cause many overdoses. Defendants, however, disseminated contrary messaging throughout their marketing campaigns to sell more opioids.

173.   **Second**, Defendants falsely instructed doctors and patients that signs of addiction are actually signs of undertreated pain and should be treated by prescribing more  opioids. Defendants called this phenomenon "pseudoaddiction" – a term coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, a KOL for Endo, Janssen, and Purdue – and claimed that pseudoaddiction is substantiated by scientific evidence. For example:

a)   Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to  obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. *Responsible Opioid Prescribing* remains for sale online.  The 2012 edition continues to teach  that pseudoaddiction is real;

b)   Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management.";

---

[236] Manchikanti, Ex. A, at 1.
[237] Barbara Zedler, M.D., *Risk Factors for Serious Prescription Opioid-Related Toxicity or Overdose Among Veterans Health Administration Patients*, Pain Medicine, 2014, at 1912, attached hereto as Exhibit F.
[238] *Id.*

c)      Endo sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials;

d)      Purdue published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."; and

e)      Purdue sponsored a CME program entitled *Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse*. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

174.    The 2016 CDC Guideline rejects the concept of pseudoaddiction. The CDC Guideline nowhere recommends that opioid dosages be increased if a patient is not experiencing pain relief. To the contrary, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment…are unlikely to experience pain relief with longer-term use,"[239] and that physicians should "reassess[] pain and function within 1 month"[240] in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids"[241] because the patient is "not receiving a clear benefit."[242]

175.    **Third,** Defendants falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allowed them to

---

[239] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[240] *Id.*
[241] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[242] *Id.*

reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients. Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting opioid therapy for chronic pain. For example:

      a)    Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers' bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts;

      b)    Purdue sponsored a 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths;" and

      c)    As recently as 2015, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

176.    Once again, the 2016 CDC Guideline confirms these representations are false. The Guideline notes that there are no studies assessing the effectiveness of risk mitigation strategies – such as screening tools, patient contracts, urine drug testing, or pill counts – widely believed by doctors to detect and deter outcomes related to addiction and overdose.[243] As a result, the Guideline recognizes that doctors should not overestimate the risk screening tools for classifying patients as high or low risk for opioid addiction because they are insufficient to rule out the risks of long-term opioid therapy.[244]

---

[243] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[244] *Id.*

177.   **Fourth**, to underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem thereby failing to disclose the increased difficulty of stopping opioids after long-term use.

178.   For example, a CME sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days. And Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation."

179.   Defendants deceptively minimized the significant symptoms of opioid withdrawal, which, as explained in the 2016 CDC Guideline, include drug cravings, anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, tachycardia (rapid heartbeat), spontaneous abortion and premature labor in pregnant women, and the unmasking of anxiety, depression, and addiction – and grossly understated the difficulty of tapering, particularly after long-term opioid use.

180.   Yet the 2016 CDC Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should be limited to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms,"[245] because "***physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days.***"[246] (Emphasis Added.)   The Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence"[247] and

---

[245] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[246] *Id.*
[247] *Id.*

highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal"[248] and pausing and restarting tapers depending on the patient's response.

181.    The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."[249] Contrary to the *Treatment Options* distributed by the APF, withdrawal from opioids involves much more than mere "physical" dependence occurring only when opioids are stopped suddenly or the dose lowered too quickly.

182.    **Fifth**, Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. For example:

a)    Purdue sponsored *APF's Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available for sale online;

b)    Endo sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain.";

c)    Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was available during the time period of this Complaint on Endo's website. In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief.";

---

[248] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[249] *Id.*

d)      Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force.  This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages;

e)      Purdue's In the Face of Pain website promotes the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will;

f)      Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages.  This publication is still available online;

g)      Purdue sponsored a CME entitled *Overview of Management Options* that is still available for CME credit.  The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages; and

h)      Purdue presented a 2015 paper at the College on the Problems of Drug Dependence, the "the oldest and largest organization in the US dedicated to advancing a scientific approach to substance use and addictive disorders," challenging the correlation between opioid dosage and overdose.

183.    These claims conflict with the scientific evidence, as confirmed by the FDA and CDC.  As the CDC explains in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established"[250] while the "risks for serious harms related to opioid therapy increase at higher opioid dosage."[251]

184.    More specifically, the CDC explains, "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages."[252] Similarly, there is an "increased risk for opioid use disorder, respiratory depression, and death at higher dosages."[253] That is why the CDC advises doctors to avoid increasing dosages above 90 morphine milligram equivalents per day.

---

[250] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[251] *Id.*
[252] *Id.*
[253] *Id.*

185.   *Finally*, Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids reliably curb addiction and abuse.

186.   More specifically, Defendants have made misleading claims about the ability of their so-called abuse-deterrent opioid formulations to deter use.  For example, Endo's advertisements for the 2012 reformulation of Opana ER claimed that it was designed to be crush resistant in a way that suggested it was more difficult to misuse the product. This claim was false.

187.   The FDA warned in a 2013 letter that there was no evidence Endo's design would provide a reduction in oral, intranasal or intravenous use.[254]  Moreover, Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed.

188.   In a 2016 settlement with the State of New York, Endo agreed not to make statements in New York that Opana ER was designed to be or is crush-resistant.  The State found those statements false and deceptive because there was no difference in the ability to extract the narcotic from Opana ER.

189.   Similarly, the 2016 CDC Guideline states that no studies support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse,"[255] noting that the technologies – even when they work – "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes."[256]

190.   These numerous, long-standing misrepresentations of the risks of long-term opioid use spread by Defendants successfully convinced doctors and patients to underestimate those risks.

---

[254] *See FDA Statement: Original Opana ER Relisting Determination*, May 10, 2013.
[255] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[256] *Id.*

**C.      Defendants Grossly Overstated the Benefits of Chronic Opioid Therapy.**

191.     To convince doctors and patients that opioids should be used to treat chronic pain, Defendants had to persuade them that there was a significant benefit to long-term opioid use. But as the 2016 CDC Guideline makes clear, there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain."[257]

192.     In fact, the CDC found no evidence showing "a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized  trials ≤ 6 weeks in duration)"[258] and that other treatments were more or equally beneficial and less harmful than long-term opioid use.

193.     Nonetheless, Defendants were legion in their misrepresentations that opioid drugs were appropriate for use as a long-term lifestyle.  For example:

> a)      Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects;
>
> b)      Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally."  The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs;
>
> c)      Purdue ran a series of advertisements for OxyContin in 2012 in medical journals entitled "pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them.  The ads implied that OxyContin improves patients' function;
>
> d)      *Responsible Opioid Prescribing* (2007), sponsored and distributed by Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online;

---

[257] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[258] *Id.*

e)      Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve." The guide was available online until APF shut its doors in 2012;

f)      Endo's NIPC website *painknowledge.com* claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website promoted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site;

g)      Endo was the sole sponsor, through NIPC, of a series of CMEs titled *Persistent Pain in the Older Patient*, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast;

h)      Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function." This video is still available today on YouTube;

i)      Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The Policymaker's Guide was originally published in 2011 and is still available online today; and

j)      Purdue's, Endo's, and Janssen's sales representatives have conveyed and continue to convey the message that opioids will improve patient function.

194.    These claims are unsupported by the scientific literature. The 2016 CDC Guideline explained, "There is <u>no good evidence</u> that opioids improve pain or function with long-term use"[259] and "complete relief of pain is unlikely."[260] The CDC reinforced this conclusion throughout its 2016 Guideline:

a)      "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year

---

[259] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[260] *Id.* (emphasis added).

later . . . ."; [261]

b) "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy.";[262] and

c) "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."[263]

195. The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations."[264]

196. Defendants also falsely emphasized or exaggerated the risks of competing products like NSAIDs so that doctors and patients would look to opioids first for treating chronic pain. Once again, Defendants' misrepresentations contradicted non-industry sponsored scientific evidence. In addition, Purdue misleadingly promoted OxyContin as unique among opioids in providing 12 continuous hours of pain relief with one dose. In fact, OxyContin does not last for 12 hours – a fact that Purdue has known at all times relevant to this action.

197. According to Purdue's own research, OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. The reason is that OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. Although the patient experiences a powerful initial response, there is little or no pain relief at the end of the dosing period because less medicine is released.

198. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a substantial number of chronic pain patients taking OxyContin experience it.

---

[261] *CDC Guidelines for Prescribing Opioids for Chronic Pain, supra.*
[262] *Id.*
[263] *Id.*
[264] *Id.*

199.     This "end of dose" failure not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience  toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

200.     Purdue's competitors were aware of this problem. For example, Endo ran advertisements for Opana ER referring to "real" 12-hour dosing.  Nevertheless, Purdue falsely promoted OxyContin as if it were effective for a full 12 hours.  Indeed, Purdue's sales representatives continue to tell doctors in and around Angelina County that OxyContin lasts a full 12 hours.

**D.     Defendants also engaged in Other Unlawful, Unfair, and Fraudulent Misconduct.**

201.     Other Defendants herein participated in illicit and unlawful prescribing of its drugs. For example, Purdue did not report illegal prescribing of OxyContin until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets. In doing so, Purdue protected its own profits at the expense of public health and safety.

202.     The State of New York also found that Endo failed to require sales representatives to report signs of  addiction, diversion, and inappropriate prescribing; paid bonuses to sales representatives for  detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had  caused them to be placed on a no-call list.

**E.     Defendants Targeted Susceptible Prescribers and Vulnerable Patient Populations.**

203.     As part of their deceptive marketing scheme, Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the U.S. and in and around Angelina

County. For example, Defendants focused their deceptive marketing on primary care doctors, who were  more likely to treat chronic pain patients and prescribe opioids, but were less likely to be educated about treating pain and the risks and benefits of opioids.

204.    Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain.  Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them.

205.    For example,  the 2016 CDC Guideline observes that existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions.  The Guideline therefore concludes that  there are "special risks of long-term opioid use for elderly patients" and recommends that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients.

206.    The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

207.    Defendants achieved their goal in targeting these vulnerable populations when the Arthritis Foundation published its *Guide to Pain Management* in 2003 ("*Pain Management Guide*").[265] The *Pain Management Guide* was published by a neutral third-party that not only believed the message Defendants had been selling for years, but it continued to relay that message to patients experiencing chronic pain – elderly patients with arthritis.[266]

208.    The *Pain Management Guide* was intended for a population of "70 million Americans who have arthritis or other related diseases."[267] It parroted falsities, such as the low risk

---

[265] Susan Bernstein, *The Arthritis Foundation's Guide to Pain Management*, Arthritis Foundation, 2003.
[266] *Id.*
[267] *Id.*

of developing an addiction to opioids and cited Defendants' false statistic: "The addiction rate from narcotics is approximately one percent."[268]

209.    The Arthritis Foundation even accepted and repeated Defendants' distinction between dependence and addiction. A person with dependence suggests he or she would experience withdrawal symptoms upon stopping opioids while addiction "is a self-destructive, habitual use" of opioids.[269] The *Pain Management Guide* brushes aside concerns about addiction and recommends higher doses of opioids for patients who develop a dependence on opioids[270] – the exact message that Defendants had been spouting for years.

210.    The fact that neutral third parties were relying on and buying Defendants' false propositions only verifies Defendants' successful fraud on the medical and non-medical community at large.

**F.    Although Defendants knew that their Marketing of Opioids was False and Deceptive, they Fraudulently Concealed their Misconduct.**

211.    Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew their misrepresentations were false and deceptive. Defendants knew that the marketing scheme being promoted by Defendants was misleading, inaccurate, and simply false. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes.

212.    In The Journal of the American Medical Association November 2002 edition, which Defendants meant to reach physicians throughout the nation, Purdue advertised OxyContin

---

[268] Bernstein, *supra,* at 70-71.
[269] *Id.* at 70.
[270] *Id.*

as a safe drug with minimal safety risks.[271] The ad depicts a man and boy fishing with a title in large white letters exclaiming that "THERE CAN BE LIFE WITH RELIEF" with "LIFE WITH RELIEF" as the largest words in the advertisement.[272] Purdue then informs physicians that "[t]he most serious risk associated with opioids, including OxyContin, is respiratory depression."[273]

213.   Purdue fraudulently represented that respiratory depression was not only the most serious risk for its own drug OxyContin, but for opioids in general, even though it knew that opioids carried a risk of addiction and death.

214.   The ad continues with benign side effects that may occur with the use of OxyContin, such as "constipation, nausea, sedation, dizziness, vomiting, pruritus, headache, dry mouth, sweating, and weakness."[274] These side effects are certainly a far cry from addiction or death.  Of course this ad also claims that OxyContin is a "continuous around-the-clock analgesic," which is equally false.[275]

215.   Because of the bold misrepresentations and omissions in its ads occurring in the October 2, 2002 JAMA issue, and one occurring in the November 13, 2002 issue, the FDA wrote a warning letter to Michael Friedman, the Executive Vice President and Chief Operating Officer of Purdue.[276]  Mr. Abrams explained that "[y]our journal advertisements omit and minimize the serious safety risks associated with OxyContin, and promote it for uses beyond which have been proven safe and effective."[277]  Mr. Abrams reprimanded Purdue for failing to present "<u>any</u> information" in the advertisement about the "potentially fatal risks" or the potential for abuse

---

[271] The Journal of American Medical Association, Nov. 13, 2002.
[272] *Id.* at 1, 3.
[273] *Id.*
[274] *Id.*
[275] JAMA, *supra*, at 1, 3.
[276] Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Michael Friedman, Exec. Vice Pres. and COO, Purdue Pharma L.P.
[277] *Id.* at 1.

associated with OxyContin.[278]

216.   Mr. Abrams was concerned that these advertisements suggested such a "broad use of [OxyContin] to treat pain without disclosing the potential for abuse with the drug and the serious, potentially fatal risks associated with its use. . . ."[279] Purdue's actions were "especially egregious and alarming" given "its potential impact on the public health."[280] Mr. Abrams pointed out to Purdue the reality that "[i]t is particularly disturbing that your November Ad would tout 'Life with Relief,' yet fail to warn that patients can die from taking OxyContin."[281]

217.   Purdue Pharma has consistently disregarded serious harm that it knew Oxycontin caused. For example, in Kentucky in 2001, three people and one estate sued Purdue for becoming addicted to OxyContin even though they were taking the drug as prescribed.[282]  Several similar lawsuits were filed against Purdue by individuals.[283]  Dr. J. David Haddox, an executive at Purdue, responded to these claims:  "A lot of these people say, 'Well, I was taking the medicine like my doctor told me to,' and then they start taking more and more and more . . . I don't see where that's my problem."[284]

218.   Not surprisingly, three current and former executives from Purdue plead guilty in 2007 to criminal charges that they misled regulators, doctors, and patients about OxyContin's risk of addiction.[285]  In pleading guilty to misbranding charges, Purdue admitted it had fraudulently marketed OxyContin as a drug less prone to addiction and as having fewer side effects than other

---

[278] Warning Letter from Thomas Abrams, *supra.*
[279] *Id.* at 2.
[280] *Id.*
[281] *Id.* at 4.
[282] Chris Kahn, *Maker of OxyContin Faces at least 13 Lawsuits,"* July 27, 2001, Port Arthur News.
[283] Kahn, *supra.*
[284] *Id.*
[285] *See* Barry Meier, *In Guilty Plea, OxyContin Maker to Pay $600 Million*, May 10, 2007, *available at* http://www.nytimes.com/2007/05/10/business/11drug-web.html; *see also* Zee, Ex. B, at 3-4.

opioids.[286] In reality, unlike most other opioids, OxyContin contained pure oxycodone without any other ingredients, which made it a higher-dose narcotic despite its time-release design that Purdue hawked as ameliorating its addictive potential.[287]

219.     Defendants avoided detection of their fraudulent conduct by disguising their role in the deceptive marketing through funding and using third parties, such as Front Groups and KOLs. Doctors and patients trusted these third parties and did not realize that it was the pharmaceutical companies that were actually feeding them false and misleading information.

220.     Defendants also manipulated their promotional materials and the scientific literature to make it appear that the information promoted was accurate, truthful, and supported by objective evidence when it was not.

221.     Thus, Defendants successfully concealed from the medical community and patients facts sufficient to arouse suspicion of the claims Angelina County now asserts. Angelina County did not know of the existence or scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

## G.     By Increasing Opioid Prescriptions and Use, Defendants' Deceptive Marketing Scheme has fueled the Opioid Epidemic and Damaged Angelina County Communities.

222.     Defendants' misrepresentations deceived doctors and patients about the risks and benefits of long-term opioid use. Studies reveal that many doctors and patients are unaware of or do not understand the risks or benefits of opioids. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were

---

[286] Meier, *supra.*
[287] *Id.*

potentially addictive.[288]

223.     Defendants' deceptive marketing scheme caused, and continues to cause, doctors in and around Angelina County to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent Defendants' fraud, these doctors would not have prescribed as many opioids that negatively impacted residents of Angelina County.

224.     Defendants' deceptive marketing scheme also caused, and continues to cause, patients to purchase and use opioids for their chronic pain believing they are safe and effective. Absent Defendants' deceptive marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them.

225.     Defendants' deceptive marketing has caused and continues to cause the prescription and use of opioids to explode.  Indeed, this dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in Defendants' spending on their deceptive marketing scheme. Defendants' spending on opioid marketing totaled approximately $91 million in 2000.  By 2011, that spending had tripled to $288 million.

226.     The escalating number of opioid prescriptions written by doctors who were deceived by Defendants' deceptive marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and Angelina County. The increase in opioid prescriptions equals an increase in "disability, medical costs, subsequent surgery, and continued or late opioid use."[289]

227.     Scientific evidence demonstrates a strong correlation between opioid prescriptions and addiction to opioids. In a 2016 report, the CDC explained that prescribing opioids has

---

[288] Hazelden Betty Ford Foundation, *Missed Questions, Missed Opportunities*, Jan. 27, 2016, *available at* http://www.hazeldenbettyford.org/about-us/news-and-media/pressrelease/doctors-missing-questions-that-could-prevent-opioid-addiction.
[289] Manchikanti, Ex. A, at 23.

quadrupled since 1999, which has resulted in a parallel increase in opioid overdoses.[290] Indeed, there has been a two-third increase in overdose deaths from using opioids since 2000.[291]  For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the cycle of opioid pain medication misuse that contributes to the opioid overdose epidemic."[292]

228.   Due to the increase in opioid overdoses, first responders, such as police officers, have been and will continue to be in the position to assist people experiencing opioid-related overdoses.[293] In 2016, "over 1,200 law enforcement departments nationwide carried naloxone in an effort to prevent opioid-related deaths."[294]

229.   Defendants' deceptive marketing scheme has also detrimentally impacted children in Angelina County. Overprescribing opioids for chronic pain has made the drugs more accessible to school-aged children, who come into contact with opioids after they have been prescribed to friends or relatives in the same household.

230.   Defendants' conduct has adversely affected Angelina County's child protection agencies in the number of children in foster care driven by parental drug addiction. Children with parents addicted to drugs tend to stay in foster care longer, and they often enter the system having experienced significant trauma, which makes these cases more expensive for counties like Angelina County.

---

[290] CDC/NCHS, *National Vital Statistics System, Mortality*, CDC Wonder, Atlanta, GA: US Department of Health and Human Services, 2016, *available at* https://wonder.cdc.gov/;  Rudd RA, Seth P, David F, Scholl L, *Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015*, Morb Mortal Wkly Rep., Dec. 16, 2016.
[291] CDC, *National Vital Statistics System, Mortality*, Morb Mortal Wkly Rep., Jan. 1, 2006, at 1378-82, Increases in Drug and Opioid Deaths – United States, 2000-2014.
[292] *CDC Guideline for Prescribing Opioids for Chronic Pain, supra; see also* Rudd, *supra*.
[293] Tex. Att'y Gen. Op. No. KP-0168 (2017).
[294] *Id. citing* http://www.nchrc.org/law-enforcement/us-law-enforcement-who-carry-naloxone/.

231.    Opioid addiction is one of the primary reasons that Angelina County residents seek treatment for substance dependence. A significant number of admissions for drug addiction were associated with a primary diagnosis of opiate addiction or dependence.

232.    Defendants' creation, through false and deceptive advertising and other unlawful and unfair conduct, of a virtually limitless opioid market has significantly harmed Angelina County communities. Defendants' success in extending the market for opioids to new patients and chronic pain conditions has created an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and injury. It has been estimated that 60% of the opioids to which people are addicted come, directly or indirectly, through doctors' prescriptions.[295]

233.    Law enforcement agencies have increasingly associated prescription drug addiction with violent and property crimes. Despite strict federal regulation of prescription drugs, local law enforcement agencies are faced with increasing diversion from legitimate sources for illicit purposes, including doctor shopping, forged prescriptions, falsified pharmacy records, and employees who steal from their place of employment. The opioid epidemic has prompted a growing trend of crimes against pharmacies including robbery and burglary. This ongoing diversion of prescription narcotics creates a lucrative marketplace.

234.    The rise in opioid addiction caused by Defendants' deceptive marketing scheme has also resulted in an explosion in heroin use. For example, heroin use has more than doubled in the past decade among adults aged 18 to 25 years.[296] Moreover, heroin-related overdoses in the United States has more than quadrupled since 2010.[297]

---

[295] Nathaniel P. Katz, *Prescription Opioid Abuse: Challenges and Opportunities for Payers*, Am. J. Managed Care, Apr. 19 2013, at 5 ("The most common source of abused [opioids] is, directly or indirectly, by prescription."), *available at* http://www.ajmc.com/publications/issue/2013/2013-1-vol19-n4/Prescription-Opioid-Abuse-Challenges-and-Opportunities-for-Payers.
[296] Centers for Disease Control and Prevention, *Vital Signs: Today's Heroin Epidemic – More People at Risk, Multiple Drugs Abused*, MMWR 2015, *available at* https://www.cdc.gov/vitalsigns/heroin/index.html.
[297] *Id.*

235.    The costs and consequences of opioid addiction are staggering.  For example, in 2007, the cost of healthcare due to opioid addiction and dependence was estimated at 25 billion, the cost of criminal justice was estimated at 5.1 billion, and the cost of lost workplace productivity was estimated at 25.6 billion.

236.    Texas had the second highest healthcare costs in 2015 from opioid abuse in the nation totaling $1.96 billion.[298] One in five Texas high school students has taken prescription drugs without a valid prescription.[299] And four of the top 25 cities for abuse in the United States – two of them located in East Texas – is in Texas.[300]

237.    Prescription opioid addiction and overdose have an enormous impact on the health and safety of individuals, as well as communities at large, because the consequences of this epidemic reach far beyond the addicted individual.

238.    Angelina County has also expended funds for false claims submitted on the County's health plans that were paid as medically necessary when they were not and prescriptions for opioids through worker's compensation benefits.

239.    The repercussions for residents of Angelina County therefore include job loss, loss of custody of children, physical and mental health problems, homelessness and incarceration, which results in instability in communities often already in economic crisis and contributes to increased demand on community services such as hospitals, courts, child services, treatment centers, and law enforcement. Defendants knew, and should have known, about the harms that their deceptive marketing has caused, and continues to cause, and will cause in the future. Defendants closely monitored their sales and the habits of prescribing doctors.  Their sales

---

[298] Craig, *Pandemic, supra.*
[299] *Id.*
[300] *Id.*

representatives, who visited doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding.

240.    Defendants also had  access to and carefully watched government and other data that tracked the explosive rise in  opioid use, addiction, injury, and death. Defendants not only knew, but intended that their misrepresentations would persuade doctors to prescribe and encourage patients to use their opioids for chronic pain.

241.    Defendants' actions are neither permitted nor excused by the fact that their drug labels may have allowed, or did not exclude, the  use of opioids for chronic pain.  FDA approval of opioids for certain uses did not give Defendants license to misrepresent the risks and benefits of opioids. Indeed, Defendants' misrepresentations were directly contrary to pronouncements by, and guidance from, the FDA based on the medical evidence and their own labels.

242.    Nor is Defendants' causal role broken by the involvement of doctors. Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed decisions. And both doctors and patients in Angelina County relied on information Defendants distributed whether it was through ads, magazines, trade journals, websites, CMEs, KOLs, and/or front groups. Defendants also hijacked what doctors wanted to believe – namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

243.    The funds that Angelina County has used and will continue to use for all the costs associated with Defendants' false, misleading, and fraudulent marketing are taxpayer funds. Defendants specifically targeted physicians in Angelina County with fraudulent claims concerning the benefits of opioids for chronic pain while omitting the lack of efficacy.

244.    Defendants also fraudulently omitted the fact that opioids were addictive even though they knew, or should have known, that physicians in Angelina County would either use the misinformation Defendants relayed to them to prescribe opioids to Angelina County residents or give this information to Angelina County residents, resulting in the over-prescribing and/or overuse of opioids in Angelina County.

245.    Defendants' actions and omissions were each a cause-in-fact of Angelina County's past and future damages. Defendants' wrongful conduct caused injuries to Angelina County in the past, continues to cause injuries to Angelina County, and will continue to cause injuries to Angelina County in the future. Future damages include, but are not limited to, additional resources for counseling and medication assisted treatment of addicts, medical treatment for overdoses, life skills training for adolescents, increased law enforcement, and additional resources to treat the psychological effects of opioids and the underlying conditions that make people susceptible to opioid addiction, all of which will be obtained through taxpayer resources.

**VII.    FIRST CAUSE OF ACTION: NEGLIGENT AND/OR INTENTIONAL CREATION OF A PUBLIC NUISANCE AGAINST ALL DEFENDANTS**

246.    Angelina County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

247.    Defendants knowingly encouraged doctors in and around Angelina County to prescribe, and residents to use, highly addictive opioids for chronic pain even though Defendants knew using opioids had a high risk of addiction and reduced quality of life.

248.    By doing so, Defendants purposefully interfered with Angelina County's public health, public safety, public peace, public comfort, and public convenience.

249.    Defendants, individually and in concert with each other, have contributed to and/or assisted in creating and maintaining a condition that is harmful to the health and safety of Angelina County residents, and/or unreasonably interferes with the peace and comfortable enjoyment of life in violation of Texas law.

250.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community – and the harm inflicted outweighs any offsetting benefit.

251.    The staggering rates of opioid use resulting from Defendants' marketing efforts have caused, and continues to cause, harm to the community including, but not limited to:

a)    Upwards of 30% of all adults use opioids. These high rates of use have led to unnecessary opioid addiction, overdose, injuries, and deaths;

b)    Children have been exposed to opioids prescribed to family members or others resulting in injury, addiction, and death. Easy access to prescription opioids has made opioids a recreational drug of choice among Angelina County teenagers; opioid use among teenagers is only outpaced by marijuana use. Even infants have been born addicted to opioids due to prenatal exposure causing severe withdrawal symptoms and lasting developmental impacts;

c)    Residents of Angelina County, who have never taken opioids, have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids and the loss of companionship, wages, or other support from family members who have used, become addicted to, overdosed on, or been killed by opioids;

d)    More broadly, opioid use and addiction have driven Angelina County residents' health care costs higher[301];

e)    Employers have lost the value of productive and healthy employees who have suffered from adverse consequences from opioid use;

f)    Defendants' success in extending the market for opioids to new patients and chronic conditions has created an abundance of drugs available for criminal

---

[301] *See, e.g.,* Manchikanti, Ex. A, at 14 (stating that the escalating use of opioids in high doses over long periods of time, lifetime use of long-acting drugs, or the combination has serious consequences for the costs of health care and economic stability).

use and fueled a new wave of addiction and injury. Defendants' scheme created both ends of a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them;

g) This demand has created additional illicit markets in other opiates, particularly heroin. The low cost of heroin has led some of those who initially become addicted to prescription opioids to migrate to cheaper heroin, fueling a new heroin epidemic in the process;

h) Diverting opioids into secondary, criminal markets and increasing the number of individuals who are addicted to opioids has increased the demands on emergency services and law enforcement in Angelina County;

i) All of Defendants' actions have caused significant harm to the community – in lives lost; addictions endured; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken families and homes;

j) These harms have taxed the human, medical, public health, law enforcement, and financial resources of Angelina County; and

k) Defendants' interference with the comfortable enjoyment of life of a substantial number of people is entirely unreasonable because there is limited social utility to opioid use and any potential value is outweighed by the gravity of harm inflicted by Defendants' actions.

252.    Defendants knew, or should have known, that promoting opioid use would create a public nuisance in the following ways:

a) Defendants have engaged in massive production, promotion, and distribution of opioids for use by the citizens of Angelina County;

b) Defendants' actions created and expanded the market for opioids, promoting its wide use for pain management;

c) Defendants misrepresented the benefits of opioids for chronic pain and fraudulently concealed, misrepresented, and omitted the serious adverse effects of opioids, including the addictive nature of the drugs; and

d) Defendants knew, or should have known, that their promotion would lead to addiction and other adverse consequences that the larger community would suffer as a result.

253.     Defendants' actions were, at the least, a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain thereby causing opioids to become widely available and used in Angelina County.

254.     Without Defendants' actions, opioid use would not have become so widespread and the enormous public health hazard of opioid addiction would not have existed and could have been averted.

255.     The health and safety of the citizens of Angelina County, including those who use, have used, or will use opioids, as well as those affected by opioid users, is a matter of great public interest and legitimate concern to Angelina County's citizens and residents. It was foreseeable to all Defendants that the burden of the opioid crisis would fall to counties like Angelina County in the form of social and economic costs. Specifically it was foreseeable that Angelina County would sustain damages as an employer obligated to provide healthcare coverage to its employees and as a local government obligated to provide public services to its citizens.

256.     The public nuisance created, perpetuated, and maintained by Defendants can be abated and further reoccurrence of such harm and inconvenience can be prevented.

257.     Defendants' conduct has affected and continues to affect a considerable number of people within Angelina County and is likely to continue to cause significant harm to patients who take opioids, their families, and the community at large.

258.     Each Defendant created or assisted in creating the opioid epidemic, and each Defendant is jointly and severally liable for its abatement. Furthermore, each Defendant should be enjoined from continuing to create, perpetuate, or maintain said public nuisance in Angelina County. Furthermore, Defendants should compensate Angelina County for the funds it has expended and continues to expend for medical insurance claims for opioids that were not medically

valid, as well as increased costs of social services, health systems, law enforcement, judicial system, and treatment facilities.

### VIII.   SECOND CAUSE OF ACTION: COMMON LAW FRAUD
### AGAINST ALL DEFENDANTS

259.    Angelina County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

260.    At all relevant and material times, Defendants expressly and/or impliedly warranted that opioids were safe, of merchantable quality, and fit for use.

261.    Defendants' superior knowledge and expertise, its relationship of trust and confidence with doctors and the public, its specific knowledge regarding the risks and dangers of opioids, and its intentional dissemination of promotional and marketing information about opioids for the purpose of maximizing sales, each gave rise to the affirmative duty to meaningfully disclose and provide all material information about the risks and harms associated with opioids.

262.    At all relevant and material times, Defendants, individually and acting through their employees and agents, and in concert with each other, fraudulently represented to physicians, who Defendants knew would justifiably rely on Defendants' representations, that opioids were safe and effective for treating chronic pain.

263.    Defendants' false representations were fraudulently made, with the intent or purpose that healthcare providers and patients would justifiably rely upon them, leading to the prescription, administration, filling, purchasing, and consumption of opioids in Angelina County.

264.    Defendants' deliberate misrepresentations and/or concealment, suppression, and omission of material facts as alleged herein include, but are not limited to:

> a)    Making false and misleading claims regarding the known risks of the addictive nature of opioids and suppressing, failing to disclose, and mischaracterizing the addictive nature of opioids and in concomitant costs,

such as overdoses, deaths, and heroin addiction;

b)      Making false and misleading written and oral statements that opioids are more effective than traditional pain killers for chronic pain, or effective at all and/or omitting material information showing that opioids are no more effective than other non-addictive drugs for chronic pain;

c)      Issuing false and misleading warnings and/or failing to issue adequate warnings concerning the risks and dangers of using opioids;

d)      Making false and misleading claims downplaying the risk of addiction when using opioids and/or setting forth guidelines that would purportedly identify addictive behavior; and

e)      Making false and misleading misrepresentations concerning the safety, efficacy and benefits of opioids without full and adequate disclosure of the underlying facts which rendered such statements false and misleading.

265.    Defendants willfully, wantonly, and recklessly disregarded their duty to provide truthful representations regarding the safety and risk of opioids, including the fact that upon information and belief, there was suspicion for diversionary purposes.

266.    Defendants made these misrepresentations with the intent that the healthcare community and patients would rely to their detriment.

267.    Defendants' misrepresentations were made with the intent of defrauding and deceiving the medical community and consumers to induce and encourage the sale of opioids.

268.    Defendants' fraudulent representations evidence their callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers living in Angelina County.

269.    Defendants omitted, misrepresented, suppressed and concealed material facts concerning the dangers and risk of injuries associated with the use of opioids, as well as the fact that the product was unreasonably dangerous.

270.    Defendants' purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of opioids.

271.    Defendants' failure to stem, rather than fuel spikes of opioid sales was intended to encourage the sale of opioids, even if the circumstances provided suspicion for diversionary purposes.

272.    The treating medical community and consumers in Angelina County did not know that Defendants' representations were false and/or misleading and justifiably relied on them.

273.    Defendants had sole access to material facts concerning the dangers and unreasonable risks of opioids, which they intentionally concealed.

274.    As a direct and proximate result of Defendants' fraudulent misrepresentations and intentional concealment of facts, upon which the medical community and consumers in Angelina County reasonably relied, Angelina County suffered actual and punitive damages.

## IX.    THIRD CAUSE OF ACTION: NEGLIGENCE
### AGAINST ALL DEFENDANTS

275.    Angelina County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

276.    Defendants have a duty to exercise reasonable care in marketing its opioids to physicians treating residents of Angelina County and Angelina County residents. Defendants have breached their duty by knowingly and fraudulently misrepresenting the benefits of, and downplaying the risks of, opioids for chronic pain.

277.    Defendants have used deceitful marketing ploys, KOLs, Front Groups, and other schemes to increase profits at the cost of public health causing an opioid epidemic. Defendants have acted willfully, wantonly, and maliciously.

278.    As a proximate result, Defendants and its agents have caused Angelina County to incur excessive costs to treat the opioid epidemic in its county including, but not limited to, increased costs of social services, health systems, law enforcement, judicial system, and treatment

facilities. It was foreseeable to all Defendants that the burden of the opioid crisis would fall to counties like Angelina County in the form of social and economic costs. Specifically it was foreseeable that Angelina County would sustain damages as an employer obligated to provide healthcare coverage to its employees and as a local government obligated to provide public services to its citizens.

279.    Angelina County and its residents are therefore entitled to actual and punitive damages.

## X.    FOURTH CAUSE OF ACTION: GROSS NEGLIGENCE AGAINST ALL DEFENDANTS

280.    Angelina County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

281.    Defendants' marketing scheme to optimize profits by misrepresenting and falsely promoting opioids as the panacea to chronic pain was done intentionally.

282.    Defendants' hiring of KOLs, Front Groups, and others to spread its fraudulent message that opioids were useful and beneficial for chronic pain was grossly negligent and done with conscious indifference or reckless disregard for the safety of others.

283.    Each Defendant's actions and omissions as described herein, singularly or in combination with each other, were malicious resulting in damages and injuries to Angelina County and its residents.

284.    At every stage, Defendants knew, or should have known, that their conduct would create an unreasonable risk of physical harm to others, including Angelina County and its residents, and should be held liable in punitive and exemplary damages to Angelina County.

## XI.   FIFTH CAUSE OF ACTION: UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

285.    Angelina County re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs of this Petition as though fully alleged herein.

286.    As an expected and intended result of their conscious wrongdoing as set forth in this Petition, Defendants have profited and benefited from opioid purchases made by Angelina County and its residents.

287.    When Angelina County and its residents purchased opioids, they expected that Defendants had provided necessary and accurate information regarding those risks. Instead, Defendants had misrepresented the material facts regarding the risks and benefits of opioids and distributed or disbursed opioids even though, upon information and belief, there was suspicion for diversionary purposes.

288.    Defendants took undue advantage and received a benefit because the County bore the cost of the externalities of Defendants' wrongful conduct. Moreover, the County had no choice and was effectively required to cover these costs to Defendants' benefit.

289.    Defendants have been unjustly enriched at the expense of Angelina County, and Angelina County is therefore entitled to damages to be determined by the jury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays:

a.    That the acts alleged herein be adjudged and decreed to be unlawful and that the Court enter a judgment declaring them to be so;

b.    That Defendants be enjoined from, directly or indirectly through KOLs, Front Groups or other third parties, continuing to misrepresent the risks and benefits of the use of opioids for chronic pain, and from continuing to violate Texas law;

c.     That Plaintiff recover all measures of damages, including punitive and exemplary damages, allowable under the law, and that judgment be entered against Defendants in favor of Plaintiff;

d.     That Plaintiff recover restitution on behalf of Angelina County consumers who paid for opioids for chronic pain;

e.     That Plaintiff recover the costs and expenses of suit, pre- and post-judgment interest, and reasonable attorneys' fees as provided by law; and

f.     That Defendants be ordered to abate the public nuisance that they created in in violation of Texas common law.

Date:  November 14, 2018

Respectfully Submitted,

**SIMON GREENSTONE PANATIER, P.C.**

*/s/Jeffrey B. Simon*
Jeffrey B. Simon
TX State Bar No. 00788420
Amy M. Carter
TX State Bar No. 24004580
1201 Elm Street, Suite 3400
Dallas, Texas 75270
Tel:  (214) 276-7680
Fax: (214) 276-7699
jsimon@sgptrial.com
acarter@sgptrial.com

**PAUL D. HENDERSON, P.C.**
Paul D. Henderson
TX State Bar No. 09426300
712 W. Division Ave.
Orange, TX 77630
Tel: (409) 883-9355
Fax: (409) 883-8377
pdhendersonlaw@aol.com

**DIES & PARKHURST, L.L.P.**
David Dies
TX State Bar No. 05850800

Steven L. Parkhurst
TX State Bar No. 00797206
1009 Green Avenue
Orange, TX 77630
Tel: (409) 883-0892
Fax: (409) 670-0888
ddies@dieslaw.com
sparkhurst@dieslaw.com